Filed 7/13/22 (unmodified opn. attached)

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

ROBERT MAURICE BLOOM,

Defendant and Appellant.

S095223

Los Angeles County Superior Court

A801380

---

## ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING

THE COURT:

The majority opinion in this matter, filed on April 21, 2022, and appearing at 12 Cal.5th 1008, is modified as follows:

The fifth sentence of the first full paragraph on page 1033 is modified to read:

There, we held that contemporaneous expert opinion constituted substantial evidence of incompetence as a matter of law.

This modification does not affect the judgment.

The petition for rehearing and motion to stay issuance of the remittitur are denied.

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

ROBERT MAURICE BLOOM,
Defendant and Appellant.

S095223

Los Angeles County Superior Court
A801380

April 21, 2022 (unmodified opinion)

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Groban, Jenkins, and Margulies[*] concurred.

---

[*] Associate Justice of the Court of Appeal, First Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. BLOOM

S095223


Opinion of the Court by Kruger, J.


After a federal court vacated his earlier conviction and sentence, defendant Robert Maurice Bloom was retried and convicted of the first degree murder of his father and the second degree murders of his stepmother and stepsister. The jury on retrial also found true a multiple-murder special-circumstance finding and various firearm- and weapon-use findings. (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(3), 1203.06, subd. (a)(1), 12022, subd. (b), 12022.5, subd. (a).) Bloom was sentenced to death. This appeal is automatic. (*Id.*, § 1239, subd. (b).)

We now affirm the judgment in part and reverse in part. At trial, defense counsel conceded Bloom's responsibility for the deaths of all three victims in an effort to pursue a mental capacity defense to the murder charges. Bloom, however, was willing to accept responsibility only for the killing of his father and expressly objected to admitting responsibility for the deaths of the other two victims. In conceding responsibility for these victims against Bloom's wishes, defense counsel violated Bloom's Sixth Amendment right to choose the fundamental objectives of his defense under *McCoy v. Louisiana* (2018) 584 U.S. ___ [138 S.Ct. 1500]. The error does not affect Bloom's conviction for the murder of his father or the associated firearm-use finding. But the error requires us to reverse the rest of the judgment, including the second degree murder convictions

relating to the other two victims, the multiple-murder special-circumstance finding, and ultimately the judgment of death. The People may retry Bloom on the relevant counts and associated enhancement and special circumstance allegations if they so choose.

## I. FACTS

Bloom was charged with and convicted of the murders of his father, Robert Bloom, Sr.; his stepmother, Josephine Bloom; and his eight-year-old stepsister, Sandra Hughes. In an earlier automatic appeal, we affirmed Bloom's conviction and death sentence. (*People v. Bloom* (1989) 48 Cal.3d 1194.) A federal court then granted habeas relief on the ground that Bloom's trial counsel had rendered ineffective assistance in the investigation and presentation of mental health evidence. (*Bloom v. Calderon* (9th Cir. 1997) 132 F.3d 1267.) This case now returns to us following Bloom's retrial for the murders.

On retrial, Bloom entered alternative pleas of not guilty and not guilty by reason of insanity. The jury found Bloom guilty of the first degree murder of his father and an associated firearm allegation but reported that it was unable to reach verdicts on the remaining counts. The prosecution then dismissed the allegations in support of first degree murder on the other two murder counts, and the jury found Bloom guilty of second degree murder as to each count. It also found true associated firearm-use and weapon-use allegations and a multiple-murder special-circumstance allegation.

After the jury returned a guilty verdict, the court held a sanity trial. The jury found Bloom sane as to the first degree murder but was unable to reach a verdict as to the two second degree murders. Defendant then withdrew his plea of not guilty

by reason of insanity and proceeded to a penalty trial, at which he represented himself. The jury returned a death verdict and the court entered judgment accordingly.

## A. Guilt Phase Evidence

### 1. Prosecution case

In 1982, Robert Bloom, Sr., his wife, Josephine (whose given name was Lucille), and her eight-year-old daughter, Sandra Hughes (also known as Sandy), lived in a house on Sancola Avenue in Sun Valley. Bloom, 18 years old at the time, stayed at the house off and on.

The murders occurred during the early morning on April 22, 1982. One witness, Dave Hughes, had been asleep with his girlfriend in a van parked in the driveway of his parents' house, which was next door to the Bloom residence. After being awakened by the sound of a toilet flushing in his parents' house, Hughes heard two people arguing outside his van. Looking out the van's rear window, he saw Bloom, Sr., on his front lawn and Bloom standing in the street. Bloom, Sr., was "hollering" at Bloom in an "angry[,] pleading" voice to "come back." Bloom, Sr., then chased after Bloom, who had taken off running down the street. A few minutes later, Bloom, Sr., and Bloom returned together. The two men entered the Bloom residence.

Hughes tried to go back to sleep but heard more arguing outside his van. Looking out again, he saw Bloom heading off in the opposite direction from the one he had previously taken, while Bloom, Sr., stood in his yard, again telling Bloom to come back. A minute or two later, Hughes heard a shot that sounded like a .22- or .25-caliber gun. Bloom, Sr., clutched his midsection, started jumping up and down and screaming, and ran toward his house. Bloom came running, pointing a rifle at

Bloom, Sr. Hughes heard two more gunshots, followed by the sound of glass breaking. Bloom, Sr., fell onto the front porch. Bloom approached and pointed a rifle at his father. Hughes heard two more shots.

Bloom ran into the house and Josephine began screaming. After two gunshots, the screaming stopped. Between 30 seconds and a minute later, there was another shot. Hughes got out of the van and entered his parents' house to call 9-1-1, then went back to the van to get his girlfriend. As he came around the side of his parents' house, he saw Bloom standing in the dining room window of the Bloom residence "messing" with his rifle. Bloom put down the gun and stared out the window. Hughes saw Bloom leave the house, put the rifle in Josephine's car, and drive away. Police arrived within five minutes.

Another witness, Moises Gameros, was living on Sancola Avenue across the street and a few doors up from the Bloom residence. Gameros woke up in the early morning hours on April 22 and heard someone repeatedly yelling "Robert." Looking out his window, Gameros saw Bloom, Sr., and Bloom walking down Sancola Avenue. Bloom was holding a rifle. Standing outside Gameros's living room window, Bloom, Sr., said, "That's it, I'm gonna call the cops," and walked back toward his house. Bloom followed and tried to enter the house after him. It appeared to Gameros that Bloom, Sr., tried to grab the rifle from Bloom from within the house. Bloom then ran from the house, with Bloom, Sr., chasing him, past Gameros's field of vision. Gameros heard a shot and heard Bloom, Sr., screaming. Bloom, Sr., turned and ran toward his house; Bloom shot him again. Bloom, Sr., reached the front stairs to his house and fell. From his vantage point, Gameros could no longer see Bloom, Sr., but he saw Bloom point the rifle downward and shoot once more.

Bloom stood in the doorway for about a minute, manipulating the rifle, and then entered the house. Gameros heard nothing further. After about 10 minutes, Bloom emerged from the house with the rifle, got into a car, and drove away.

Sergeant Joseph Dvorak of the Los Angeles Police Department was the first to respond to the scene. He found Bloom, Sr., in the front doorway and Josephine in a hallway or bedroom. Both were dead. Sandra was found in a different bedroom, alive but seriously injured. After an ambulance arrived and took the child, Dvorak secured the crime scene. Sergeant Michael McKean of the Los Angeles Police Department arrived about 4:15 a.m. Along with two other police cars, he drove to the home of Bloom's girlfriend, accompanied by a neighbor who knew its location. The neighbor saw Bloom walking westbound on Nettleton Avenue, two and a half to three miles from the Sancola residence, and pointed him out. Officers arrested him. Later that day, McKean located Josephine's car parked on the street a mile and a half to two miles from where Bloom was arrested.

A later autopsy determined that Bloom, Sr., had died of gunshot wounds to the abdomen, neck, and cheek. Josephine suffered three fatal gunshot wounds to the head. Sandra sustained a graze wound to the right shoulder and a gunshot wound to the head that led to her death after time spent on a respirator. She also suffered 23 stab and cutting wounds to the head, neck, right arm, torso, and back, as well as superficial wounds to the inside of her left wrist and forefinger, all inflicted by a pointed instrument such as a pair of scissors. From the nature of the stab wounds, it appeared Sandra was moving around when they were inflicted; she was shot after being

stabbed and cut. Toxicology reports on Bloom, Sr., and Josephine were both negative for drugs and alcohol.

Various witnesses testified about events occurring in the days preceding the killings. Martin Medrano, an acquaintance of Bloom's who testified at the first trial, was deceased by the time of the retrial; his prior testimony was read to the retrial jury. In April 1982, Bloom said he had a contract to kill someone and offered Medrano $1,200 to get him a gun. Medrano, a drug addict who was on parole, said he intended to take Bloom's money but not give him a gun. Bloom approached Medrano several more times. Medrano asked if he had the money; Bloom told Medrano he would get it and that Medrano would read about the killing. At the time Medrano testified, he was in custody for armed robbery. He had seen Bloom in jail and reported his earlier dealings with him to a deputy sheriff. No promises were made to Medrano in connection with his testimony.

Ricardo Avila testified that in 1982 he and his then-girlfriend, Christine Waller, both 14 years old, were friends of Bloom's. They spent time with Bloom at the homes of Waller's mother and of Bloom, Sr. According to Avila, Bloom and Bloom, Sr., argued frequently about everything Bloom did. Bloom never fought back physically. Two days before the killings, Avila was watching television with Waller in her family's living room when he saw Bloom pass by outside the window holding a rifle. Avila heard "five or six pops" and went toward the back of the house, where he saw Bloom entering through a sliding door, hiding a rifle under his jacket. The day before the killings, Bloom, Sr., came to Waller's residence looking for Bloom, who was not there. Avila went to Bloom's workplace and told him his father had come looking for him.

Bloom went to a pay phone, called his father, and said, "You're running my life now, but you won't be for long."

Waller testified at Bloom's first trial but was unavailable for the retrial; her prior testimony was read to the retrial jury. In 1982, Waller had had a very close relationship with Bloom, who would often come over to her house and sometimes sleep there. On the evening of April 20, 1982, two days before the killings, she saw Bloom outside her house carrying a rifle she recognized as her brother's toward a vacant field. The following day, Bloom was again at Waller's house and was planning to spend the night; her mother asked her to wake him up the next day at 5:00 a.m. That evening, Bloom looked pale, quiet, and tense, the way he did when he was upset; later, however, Waller's mother, Norma White, thought he looked normal. On the morning of April 22, Waller knocked on the door of the bedroom Bloom occupied but received no response. When she opened the door, the light was on and the bed looked like it had been slept in, but Bloom was not there.

Whenever Waller saw Bloom with his father, Bloom, Sr., appeared "always angry" at Bloom, who could never seem to satisfy him. Bloom would sometimes cry after confrontations with his father. During visits to the Bloom residence, Waller saw Bloom take good care of his stepsister Sandra, playing with her and fixing her food to eat.

White's son, Raul Rosas, testified he was living in White's house at the time of the killings and knew Bloom. Rosas owned a .22-caliber semiautomatic rifle, which he initially kept unloaded in his bedroom but then kept in the trunk of his car after some gang members shot at him. He never showed the gun to Bloom. Rosas was at home on April 21, 1982, the day before

the killings, and saw Bloom, who appeared normal. The following day, after learning of the shootings, Rosas discovered his gun was missing and notified police.

### 2. *Defense case*

Bloom had pleaded not guilty and not guilty by reason of insanity to all charges. At the guilt phase, the defense presented evidence to show that Bloom was suffering from severe mental impairments that prevented him from forming malice. The defense also presented evidence suggesting that Bloom, Sr., had abused Bloom and that the killings were committed in the heat of passion.

Bloom's mother, Melanie Bostic,[1] testified that Bloom, Sr., was physically abusive and pushed her down a flight of stairs while she was pregnant with Bloom. Bloom, Sr., began hitting and slapping Bloom when he was still a baby. He would also scream at him, use foul language, and deliberately scare him. He once ripped apart Bloom's favorite stuffed animal in front of him. He would proclaim he was God and that he was going to kill Bloom. Melanie left the marriage when Bloom was in the first grade. At the time, he seemed like a normal little boy, but he did not have any real friends; he instead had an imaginary friend named Tony.

Robin Bucell was married to Bloom, Sr., for about three years after Melanie left the family. At the start of the marriage, Bloom was a small and scrawny 10-year-old and the focus of his father's abuse. Bloom, Sr., would slap, beat, and belittle him. Bloom, Sr., also emotionally manipulated Bloom by telling

---

[1]     To avoid confusion, we will refer to Melanie Bostic and her son Byron Bostic by their first names. No disrespect is intended.

Bloom that he loved him but his mother did not. Melanie, Bloom's mother, visited irregularly, and although she was affectionate toward Bloom, her visits were marked by hostility and physical violence with Bloom, Sr., which upset Bloom. Bloom, Sr., would threaten to kill Bucell and members of her family, a threat she found credible because he claimed to be a Mafia hit man. Bloom, Sr.'s mother came to live with them for about a year, during which time he took her Social Security checks and was mean and rude to her. Bucell had a son, Eric, with Bloom, Sr. Eventually, in fear for their safety, she left with Eric and divorced Bloom, Sr. On cross-examination, Bucell testified that while she was married to Bloom, Sr., Bloom developed a kidney condition for which he had weekly medical appointments, but at no time did a doctor raise suspicions of physical abuse.

Eric Bloom[2] testified that his father married Josephine when he was five or six years old. Bloom, Sr., did not physically abuse Eric, but he did beat Bloom "all the time," and Eric heard Bloom express fear of their father. Bloom, Sr., would dunk Bloom's head in the toilet and throw plates at him. After one beating about a month before the killings, Bloom told Eric he couldn't take much more of the pain and didn't think he would live to his next birthday. When Bloom, Sr., and Josephine fought, Bloom would take Eric out of the house. Bloom would also get between Eric and his father when Bloom, Sr., yelled at Eric.

Neuropsychologist Dale G. Watson offered expert testimony relating to Bloom's mental state. Dr. Watson

---

[2]     Again, to avoid confusion, we will refer to Eric Bloom by his first name.

9

evaluated Bloom in 1993 and again in 1999 and 2000, administering comprehensive neuropsychological tests. In neither test administration did Dr. Watson detect evidence of malingering. The 1993 testing revealed "severe neuropsychological impairment" indicative of "very significant neuropsychological deficits." The impairment was associated with both the left and right hemispheres, but primarily the right. Bloom's deficits affected his ability to read social cues and process emotions. He also exhibited significant impairment in problem solving. Bloom's verbal IQ was 95 — average being 100 — but his performance IQ was 67, in the very impaired range; the striking disparity between the two scores suggested the presence of brain damage or impairment. The 1999 and 2000 testing yielded results consistent with the prior testing, with a verbal IQ of 112, in the high average range, and a performance IQ of 65, in the extremely low range, with right hemisphere impairment still evident. During the evaluation, Bloom exhibited or related certain compulsive behaviors and "oddities," such as reciting the entire sequence of English monarchs. His developmental anomalies, such as dysmorphic facial features and the presence of two kidneys on one side of his body, were consistent with birth defects. Such defects can be related to fetal alcohol syndrome or fetal Dilantin syndrome, a consequence of an antiseizure medication now known to affect fetal health that Dr. Watson testified Bloom's mother took while pregnant. Further, according to Dr. Watson, Bloom likely suffered brain damage in a drowning incident when he was two years old. Loss of oxygen supply can cause permanent brain deficits and personality changes. Dr. Watson diagnosed Bloom as having cognitive disorder not otherwise specified and/or severe nonverbal neurocognitive dysfunction. His report on his

2000 evaluation opined that at the time of the homicides Bloom was, because of a mental defect, unable to comprehend his duty to govern his conduct in accordance with the law. Dr. Watson concluded that Bloom was in a dissociative state from the time he shot his father until the killings were over. Dr. Watson was uncertain whether Bloom was dissociating when he and his father were going up and down the street before the shooting.

Forensic psychiatrist Mark J. Mills also testified for the defense in the guilt phase. Dr. Mills had become involved in the case in 1993 when the judge who was then presiding over Bloom's federal habeas corpus proceedings consulted him concerning issues related to Bloom's mental health. (The retrial jury was not told the precise nature of those proceedings.) In 1999, trial counsel retained Dr. Mills and provided him with voluminous records he had not seen at the time of the earlier consultation. Review of the additional material led Dr. Mills to revise his earlier opinions. Specifically, he diagnosed Bloom with Asperger Syndrome, a developmental disorder on the autism spectrum, and concluded Bloom had suffered extreme emotional and physical abuse as a child. Abused children often dissociate — that is, they enter a state of partial consciousness or partial awareness — as a way of coping with the pain and fear engendered by the abuse, and Bloom was more prone to dissociation by virtue of the brain dysfunction Dr. Watson had identified. Dr. Mills believed Bloom was in a dissociative state around the time of the killings, a conclusion for which he found support in the testimony of eyewitnesses Dave Hughes and Moises Gameros regarding Bloom's apparently ambivalent and purposeless actions immediately after the shootings. Bloom was also often paranoid and tolerated the administration of antipsychotic medication at levels that would sedate an

ordinary person. Dr. Mills acknowledged that although in general determining a person's mental state 11 years after the fact is very difficult, a diagnosis of Asperger Syndrome can be reliably made at a long remove because it is a lifelong developmental condition; if it exists currently, it would have existed in the past. Asperger Syndrome impaired Bloom's social and emotional reciprocity and ability to empathize, although he retained an intellectual appreciation of the effects of his actions.

A third mental health expert, psychiatrist William Vicary, testified that he had originally been appointed by the trial court in May 1984 to assess Bloom's competence for a hearing in a low-complexity matter.[3] Dr. Vicary talked with Bloom in jail, reviewed his jail medical records, and spoke with sheriff's deputies who knew Bloom. At that time, Bloom was paranoid and to some extent out of touch with reality. Dr. Vicary concluded that Bloom understood the nature and purpose of the proceeding. Dr. Vicary also found, though with a lower level of confidence, that Bloom could rationally participate in the proceeding.

In 1993, Dr. Vicary reviewed additional records and interviewed Bloom again. After doing so, he reconsidered his earlier opinion and concluded Bloom had not been mentally competent for most of the prior proceedings. Dr. Vicary believed Bloom suffered from serious mental illness (which he did not diagnose specifically) and brain dysfunction. The combination of mental illness and brain dysfunction made Bloom likely to

---

[3]     The retrial jury was not told the earlier hearing was the original sentencing proceeding in this case.

"snap" — to suffer a psychotic break or an "emotional explosion," or to dissociate — under stress.

## B. Sanity Phase

Following Bloom's convictions in the guilt phase, the jury heard the trial of Bloom's insanity defense.

Psychiatrist Philip E. Wolfson testified for the defense that he had examined Bloom over a total of about 20 hours between 1990 and 1992 at the request of Bloom's then-attorney, seeking to understand Bloom's state of mind at the time of the killings. Bloom had described various versions of events over the years since the crimes, and to get from him what Dr. Wolfson termed "the closest approximation of the truth," the psychiatrist had to earn his trust and break down his defenses.

Dr. Wolfson concluded that in the year or so before the killings Bloom began to suffer from significant mental illness, which he diagnosed as a mixed personality disorder with borderline and dependent features. Borderline personality disorder is characterized by a pervasive pattern of instability of interpersonal relationships, self-image, moods, and emotions, as well as marked impulsivity, beginning by early adulthood. Bloom's interpersonal relationships were poorly developed; he tended to either idealize people in his life or put them down. He had an extremely poor and unstable self-image and was often the butt of others' derision. His moods and feelings were variable and unstable. At times Bloom felt extremely depressed and worthless; at other times he was extremely agitated; and in some moments he seemed psychotic. His behavior during his time in high school (classmates described him as weird and strange) and in the Navy (he failed to follow basic hygiene or maintain appropriate comportment), as well as his commission

of an attempted robbery with a BB gun, all revealed his impulsivity and lack of control. Fear of abandonment is characteristic of borderline personality disorder and was a constant theme in Bloom's life from his mother's leaving the family, to his father's disappearances and jail time, until shortly before the killings, when Bloom, Sr., was reportedly about to put the house up for sale and move, leading Bloom to fear he would be left behind. The abandonment and traumatic punishment Bloom experienced contributed to his chronic feelings of emptiness. In the year before the homicides Bloom also experienced transient stress-related paranoid ideation and dissociative symptoms to a degree that sometimes seemed psychotic.

Bloom also exhibited less fully developed traits of dependent personality disorder, which is characterized by a pervasive and excessive need to be taken care of that leads to submissive and clinging behavior and fears of separation beginning by early adulthood. Dr. Wolfson attributed Bloom's apparent inability to leave his father's home, despite being abused and denigrated, to the effects of this disorder.

Dr. Wolfson testified that when Bloom was about to graduate from high school, his living situation was unstable and he lacked consistent support. He had no real career path and, to his distress, was discharged from the Navy as unfit after an enlistment of less than a month. After Bloom's discharge, as Bloom, Sr., was going to jail for fraudulent business activities, Bloom stayed briefly at his mother's house until he himself was jailed for the aforementioned robbery with a BB gun. Dr. Wolfson related that in connection with that crime, some five months before the homicides, Dr. Richard Naham had evaluated Bloom and found him to be paranoid and on the verge

14

of a nervous collapse. Dr. Naham wrote in his report at the time that without inpatient psychiatric treatment Bloom would continue to present a danger to others.

Dr. Wolfson further testified that, following his release from custody, Bloom moved in with Bloom, Sr., who meanwhile had married Josephine, but he also spent considerable time in the home of his friend Christine Waller. Bloom idealized Waller's mother, Norma White, as the mother he wished he could have had. Bloom's relationship with his father continued to deteriorate, as Bloom, Sr., took Bloom's money for his own purposes and tried to get Josephine to sign over her rights to their house. Bloom, Sr., had engaged in numerous other scams that Bloom recognized and disapproved of. Bloom's frustrations exacerbated his confusion, impulsivity, and irrationality. Bloom's morality was split, making him both a person with "a high moral sense" and someone "who could be a con himself."

Dr. Wolfson testified that Bloom had long entertained homicidal thoughts toward his father. Seeing a rifle at White's house catalyzed a feeling that he could actually kill Bloom, Sr. Bloom started preparing a fictitious alibi involving intruders trying to break into the White residence, but his planning was poor and unrealistic. He was later seen by members of the White family practicing with the rifle. On the night of the killings, he took the rifle and returned to his father's house intending to kill Bloom, Sr., but, in Dr. Wolfson's opinion, he was not planning to harm Josephine or Sandra. At the moment he shot Bloom, Sr., Bloom lacked the capacity to conform his conduct to the requirements of the law because he did not view shooting his father as unjust. According to Dr. Wolfson, Bloom's belief that the only way out of his difficult situation was to shoot his father, and then his going ahead and doing it, was insane.

As Dr. Naham's evaluation had warned, Bloom's connection to reality had loosened and he had become psychotic. When Bloom shot Josephine and Sandra, he was in an altered state, acting without a mental process.

Dr. Wolfson acknowledged that Bloom had told many lies and given different versions of the events at issue over multiple interviews, and Dr. Wolfson had had to seek corroboration for Bloom's statements. In response to the prosecutor's hypothetical question, Dr. Wolfson could think of no situation in which it would be sane and rational for a person who had just killed his father to murder two eyewitnesses to the killing. Dr. Wolfson believed it would be irrational to wear a trench coat to hide the fact one is carrying a rifle, as Bloom did in 1981 in connection with an incident unrelated to the homicides, the previously mentioned attempted robbery with a BB gun. Bloom's planning of the killing of his father and the continuation of his goal-directed behavior after the killing similarly, in Dr. Wolfson's view, reflected insanity. In his fifth interview with Dr. Wolfson, Bloom stated: "If things had gone right, [Bloom, Sr.,] would have gotten hit when he was alone. It's tricky because Josephine and Sandra were just witnesses. They'd still be alive." The statement did not make sense to Dr. Wolfson "given the whole construction of the facts," and he noted Bloom later retracted it. Dr. Wolfson believed Bloom was telling the truth when he later claimed he did not know why he killed Josephine and Sandra because it was while making this claim, as opposed to the other explanations he had offered in recounting their killings, that he had the most profound emotional reaction and remorse.

Dr. Wolfson disagreed with some of the other experts who had been consulted in the case. He did not agree with Dr. Mills

16

that Bloom had Asperger Syndrome. Nor did he agree with another doctor who had opined that Bloom was not psychotic, or a doctor who had opined that Bloom was sane when he killed his father. Finally, he did not agree with Dr. Watson's diagnosis of severe brain impairment.

The prosecution presented no evidence at the sanity phase.

### C. Penalty Phase

#### 1. *Prosecution case*

The prosecution presented victim impact evidence as well as evidence of Bloom's involvement in several prior incidents of violence or threatened violence, including: (1) a November 1981 robbery in which Bloom pulled a BB gun out of a trench coat, grabbed the purse of a woman attending a Bible study group, and fled after he was thwarted; (2) a May 1984 incident at the law library in Men's Central Jail, in which Bloom was seen holding a knife and running away from another inmate, who was bleeding; and (3) Bloom's February 1982 statement to Josephine's uncle, at Josephine's wedding to Bloom, Sr., that he wanted to kill Josephine and Sandra because they were "in the way." Bloom added that he had "a half brother that's in the way and I don't need two more in the way," and threatened Josephine's uncle that if he got "in the way, I will kill you."

#### 2. *Defense case*

Bloom successfully moved to discharge his attorneys and represent himself at the penalty phase. He presented the testimony of several inmates and sheriff's deputies regarding his character.

Three female witnesses testified that while incarcerated they had met Bloom on the bus transporting inmates from jail

to court. Each testified Bloom was polite and respectful. The inmate Bloom had stabbed in the law library testified that Bloom explained he "met a girl who apparently read [about his] case in the newspaper at the time and [he] wanted to catch a case to stay down there." Three sheriff's deputies testified that they had interacted with Bloom in the courthouse lockup, the courtroom, and the jail, respectively, and that he had behaved in a cooperative and respectful manner.

The defense also called Paul Mones, an attorney, author, and lecturer who specializes in parricides — that is, cases involving children, teens, and adults who kill their parents. After studying Bloom's case, Mones formed the opinion that at the root of the homicides was years of abuse Bloom, Sr., perpetrated on Bloom.

Bloom's half brother Byron Bostic testified that since he was eight or nine years old, he had been visiting Bloom at the prison, bringing his own family as he grew older. The visits were always peaceful; there were never any problems, and Bloom was never violent or threatening. Anna Maria Dean, age 10 and the daughter of Byron's partner, testified that she had visited Bloom at the prison, loved him, and was not afraid of him.

Melanie Bostic, Bloom's mother, testified about Bloom, Sr.'s, abusive conduct toward Bloom, first striking him when he was a month old, beating him when he was a toddler, and eventually threatening to kill him. Melanie also testified about her relationship with Bloom, Sr., which was fraught with arguments and violent abuse. Melanie left her marriage to Bloom, Sr., when Bloom was in elementary school. When Bloom visited her after the divorce, Melanie's boyfriends sometimes

abused him, and Bloom also witnessed them committing acts of violence against her.

Robin Bucell was married to Bloom, Sr., from August 1974 to August 1977. Bloom, Sr., forced her and Bloom to lie for him in his fraudulent schemes, threatening them with bodily harm if they refused. She had a child, Eric, with Bloom, Sr.; eventually, out of concern for her and Eric's safety, Bucell left Bloom, Sr.

Superior Court Judge Michael Hoff testified that Bloom's case was assigned to his courtroom from July 1998 to September 2000. During that period, Bloom appeared to Judge Hoff to be competent. On multiple occasions, Bloom unsuccessfully sought to fire his appointed counsel because he disagreed with the psychiatric defense they were planning to present; Bloom once attempted to assert his right to represent himself, although he later changed his mind. Judge Hoff did not know whether or not Bloom was sincere in his requests. Some of the things Bloom said "made sense" and were "very skillful"; others were "somewhat stupid."

Finally, Bloom testified on his own behalf and provided his account of the crimes and incidents described in the prosecution case. Bloom argued that his father got what he deserved, and Bloom's only regret was not killing him when he was 16 or 17, because then his father would never have been involved with Josephine and Sandra. Bloom denied ever asking Medrano for a gun, offering him money for a gun, or telling him he was planning to kill someone. Bloom confirmed the account of the jailhouse stabbing and claimed he tried to commit the church robbery because his father had needed money and told him to get him some.

Bloom testified it was counsel's idea, not his, to present a mental capacity defense; he denied he was mentally impaired. He reviewed the diagnostic criteria for Asperger Syndrome and argued he met none of them.

## II. DISCUSSION

### A. Pretrial Issues and Issues Affecting the Entire Trial

#### 1. *Constitutionality of retrial*

The murders in this case occurred in 1982. Bloom was first convicted in late 1983 and sentenced in 1984. In 1997, a federal court granted Bloom relief from his conviction and sentence on the ground that his counsel had rendered constitutionally ineffective assistance in the investigation, preparation, and presentation of mental health evidence at trial. (*Bloom v. Calderon, supra,* 132 F.3d 1267.) Retrial took place in 2000, more than 18 years after the crimes. By that time, the two mental health professionals who had examined Bloom shortly before and after the offense, Dr. Arthur S. Kling and Dr. Richard Naham, had become unavailable.

Before the retrial, the defense moved to dismiss the charges, contending the experts' unavailability deprived Bloom of a meaningful opportunity to present a complete defense. The trial court denied the motion, though it also ruled there could be no mention at the retrial of the verdicts from the first trial. (See Pen. Code, § 1180.) The defense then filed a supplemental motion renewing the argument that the murder charges should be dismissed or, in the alternative, that the court should preclude charges greater than manslaughter, preclude the possibility of the death penalty, or provide for other curative measures to reduce the prejudice from the passage of time and

from former trial counsel's constitutionally inadequate performance. The court denied the supplemental motion.

Bloom contends the court's rulings denied him his rights to due process, to present a defense, and to the effective assistance of counsel. He argues that the passage of time before retrial, and the consequent unavailability of the two expert witnesses, critically undermined his principal defense — namely, that he lacked the mental state required for murder. The defense was forced to present experts who had not personally examined Bloom near the time of the offenses, a point the prosecution highlighted in cross-examination and closing argument.

We find no error in the trial court's decision to allow the retrial to take place, notwithstanding the unavailability of Drs. Kling and Naham. Bloom relies on a series of cases concerning the constitutional right to a speedy trial, which observe that the loss of witnesses and other evidence may be a cost of pretrial delay. (E.g., *Barker v. Wingo* (1972) 407 U.S. 514, 532.) But case law also makes clear that following a reversal of a prior conviction, the prosecution is entitled to retry the defendant " 'in the normal course of events' " (*People v. McDowell* (2012) 54 Cal.4th 395, 413, quoting *United States v. Ewell* (1966) 383 U.S. 116, 121), and no speedy trial inquiry is even necessary unless the prosecution engages in undue delay in proceeding with retrial (see *Barker*, at p. 530; *McDowell*, at pp. 414–415). This is true even where the process of judicial review results in substantial delays. (See *McDowell*, at pp. 413–416 [finding no error where penalty retrial took place 15 years after initial penalty phase].) Here, Bloom does not argue that the state unnecessarily delayed retrial after the federal court granted him habeas relief. The great bulk of the delay of which

he complains is instead attributable to the process of appeal and postconviction review. Where, as here, "defendant has benefitted from the careful and meticulous process of judicial review, he cannot now complain that the process 'which exists to protect him has violated other of his rights.'" (*Id.* at p. 415.)

Even so, Bloom contends that the trial court should have dismissed the case or taken steps to limit the prejudice caused by the unavailability of the two expert witnesses. He points to *People v. Sixto* (1993) 17 Cal.App.4th 374 (*Sixto*), which, like this case, involved a retrial following reversal of a conviction due to former trial counsel's constitutionally ineffective performance — there, failure to have blood samples properly analyzed to support a drug-related diminished capacity defense. Also, much as in this case, relevant evidence became unavailable before the retrial occurred; the blood sample had not been preserved. The *Sixto* court addressed the possibility that the loss of evidence might require curative measures, though it ultimately concluded that the loss of the defendant's blood sample did not require such measures in the defendant's case. (*Id.* at p. 396; see *id.* at p. 399 [courts have discretion to determine appropriate admonitions or other measures].) The court explained that "retrial counsel were able to bring out significant evidence which was not presented at the first trial. Thus, the second trial was not rendered a meaningless, futile replay of the first proceedings, even absent some sort of curative measures by the trial court." (*Id.* at p. 396.)

*Sixto* does not help Bloom's case. The unavailability of Bloom's original experts did not prevent him from putting on a mental state defense at the retrial; indeed, several experts testified on his behalf. Nothing in *Sixto* or any other case Bloom has cited supports the argument that due process nonetheless

required the extreme step of dismissing or limiting the charges against him. And to the extent Bloom argues that the trial court erred in failing to instruct the jury not to consider the passage of time in its evaluation of the evidence, neither *Sixto* nor any other cited case supports the argument. (See *Sixto, supra,* 17 Cal.App.4th at pp. 390–392, 401–402 [upholding trial court's refusal to give the defendant's requested curative instructions].) Here, the requested instructions would have hampered the jury's realistic evaluation of the evidence; even defense expert Dr. Mark Mills acknowledged that the passage of time affected his ability to discern what Bloom was like when the offenses were committed (though Dr. Mills still maintained that the particular Asperger Syndrome diagnosis he had reached was valid regardless of the passage of time).

Bloom raises various other objections to the conduct of the retrial. Bloom argues that even though the trial court had forbidden references to the verdicts from his first trial, the prosecution improperly injected the prior trial into the retrial by referring to or relying on the prior testimony of witnesses.[4] He also contends that the prosecution improperly asked questions that either obliquely referred to, or solicited responses that referred to, Bloom's prior incarceration. But contrary to Bloom's arguments, none of these references violated either Penal Code section 1180, which forbids references to former verdicts or findings, or his due process rights. None of the references to witnesses' prior testimony directly revealed the verdict reached

---

[4]    We address below, in part II.B.2., Bloom's contention that the unavailability of lay witnesses Christine Waller and Martin Medrano at the retrial undermined his defense and prevented a fair trial.

in Bloom's prior trial. Nor did they encourage the jury to draw inferences that risked "implying prior criminality," thus "prejudic[ing] defendant in the eyes of the jury." (*People v. Kessler* (1963) 221 Cal.App.2d 187, 192.) It is true that the references would have led jurors to assume Bloom had previously been tried and that he had been detained before the retrial, but as both sides in the case acknowledged, that information was inevitably going to come out and on its own raised no unacceptable risk of prejudicing Bloom in the eyes of the jury.

### 2. *Failure to conduct competency proceedings*

Bloom contends the trial court violated his state and federal constitutional rights by failing to suspend his trial and institute competency proceedings at various points in the proceeding as information calling his competence into question came to its attention. Even if no single piece of evidence compelled such a response from the trial court, he contends, the cumulative weight of the information should have led the court to declare a doubt as to Bloom's competency and institute proceedings under Penal Code section 1368.[5] We reject the argument.

---

[5]     Penal Code section 1368 provides for suspension of the criminal proceedings and a hearing on the defendant's competence to stand trial whenever a doubt about competence arises in the trial court. (Pen. Code, § 1368, subds. (a), (b).) Proceedings are suspended until competence is determined, but the jury remains impaneled and sworn unless the court determines undue hardship would result if the jurors remained on call. If the defendant is determined to be incompetent, the jury is dismissed. (*Id.*, subd. (c).)

### a. *General principles*

" 'Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent.' (*People v. Rogers* (2006) 39 Cal.4th 826, 846 [48 Cal.Rptr.3d 1, 141 P.3d 135]; see [Pen. Code,] § 1367, subd. (a); *Drope v. Missouri* (1975) 420 U.S. 162, 172 [43 L.Ed.2d 103, 95 S.Ct. 896].) 'A defendant is incompetent to stand trial if [he] is unable to consult with [his] attorney with a reasonable degree of rational understanding or lacks a rational and factual understanding of the proceedings against [him].' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 720–721.)

" 'The decision whether to order a competency hearing rests within the trial court's discretion, and may be disturbed upon appeal "only where a doubt as to [mental competence] may be said to appear as a matter of law or where there is an abuse of discretion." [Citation.] When the court is presented with "substantial evidence of present mental incompetence," however, the defendant is "entitled to a section 1368 hearing as a matter of right." [Citation.] On review, our inquiry is focused not on the subjective opinion of the trial judge, but rather on whether there was substantial evidence raising a reasonable doubt concerning the defendant's competence to stand trial. [Citation.] . . . A trial court reversibly errs if it fails to hold a competency hearing when one is required under the substantial evidence test.' " (*People v. Woodruff, supra*, 5 Cal.5th at p. 721.)

Bloom contends that the trial court should have declared a doubt and held a competency hearing at each of the three

phases of the trial: guilt, sanity, and penalty. We address in turn Bloom's competence at the guilt and sanity phases.[6]

### b. Guilt phase

Bloom contends that during the guilt phase of the trial, various circumstances were made known to the court that should have prompted it to suspend proceedings. As an initial matter, when the case was returned to Los Angeles County Superior Court for retrial in 1998, the court was aware that the 1983 proceedings had included a trial pursuant to Penal Code section 1368, just before sentencing, in which the jury had found Bloom competent. The federal court had also vacated Bloom's 1983 convictions on grounds of ineffective assistance of counsel for failure to adequately prepare and present a mental disorder defense. (*Bloom v. Calderon, supra*, 132 F.3d at pp. 1277–1278.) In September 1998, soon after Bloom was received in county jail pending retrial, the court received notice that Bloom had been admitted to a forensic inpatient program under Welfare and Institutions Code section 5150 on a finding that he was gravely disabled or a danger to himself or others. Two months later, Bloom made a *Marsden*[7] motion seeking substitution of counsel. During a hearing on the motion, Bloom complained that his trial counsel were insisting on presenting a psychiatric defense against his wishes because his federal appellate counsel had instructed them to do so.

Near the beginning of the retrial, in January 1999, Judge Hoff — to whom the case was initially assigned for retrial —

---

[6] We need not address Bloom's competence during the penalty phase because, as discussed *post* at page 45, the penalty verdict must be reversed for other reasons.

[7] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

ordered an evaluation of Bloom's competence in connection with his motion for self-representation, but Bloom withdrew his motion and no evaluation took place.

Before the start of the retrial — in connection with a motion to exclude the prior testimony of Martin Medrano and Christine Waller (see pt. II.B.2., *post*) — the defense presented the 1993 declarations of five mental health professionals opining that Bloom had been incompetent at his first trial because of severe, long-standing mental illness and brain damage. At the hearing on the motion, defense counsel characterized Bloom's present competence as "a fluid issue" that was being assessed "day to day." The prosecutor, seeking clarity regarding whether or when Bloom's competence would be litigated during the retrial, suggested that if he was incompetent at the first trial, there was no reason to believe he was competent for retrial. The trial court observed a new physical behavior on Bloom's part (he was "swaying"), but did not suspend proceedings for a competence hearing.

On the day before opening statements, the parties and the court discussed Bloom's desire to represent himself in the penalty phase should the case get that far. The discussion returned to the issue of Bloom's competence. Defense counsel Seymour Applebaum said that in his view "Mr. Bloom has always been skirting the edges of incompetence," particularly as to his ability to cooperate with counsel, but pointedly stopped short of declaring a doubt as to Bloom's present competence. Alluding to "the voluminous materials in preparation that arose out of the various appeals and ultimately the habeas proceedings and what the lawyers and the various mental health professionals did, our predecessors did," counsel explained that in the posture of this case Bloom's cooperation in

27

the factual aspects of preparation for trial was unnecessary. "But as we get closer, he's again skirting the edges of his ability to cooperate with counsel, interference in the trial process due to a mental illness, disease or defect, and I think the court needs to be aware of this. [¶] It's something that's concerned me, it's something that's always troubled me, and if this were a different type of case in terms of how it came to us, vis-à-vis the preparation that needed to be done, where I needed to confer with the client, needed to plan strategy with the client, I would have declared a [Penal Code section] 1368 doubt eons ago. [¶] . . . [¶] Quite truthfully, if there is interference where he is in my view not cooperating with preparation of the case in a rational way, where he starts interfering with the tactical process, my view is that I will have to declare a doubt and then we'll do what we have to do." The retrial proceeded without a hearing on competence under section 1368.

From time to time throughout the retrial proceedings, Bloom engaged in odd behaviors, calling mental health expert Dr. Sharma "a Christian spy"; suggesting there were poisoned ants on cookies provided by the jail; referring to defense counsel Tonya Deetz as the "consigliere of the principality of Israel," the last phrase (the principality of Israel) seemingly referring to himself; referring to prosecutor Shellie Samuels as "one of [his] subjects"; and calling Judge Schempp the "lady of the court." When Bloom learned that Judge Hoff's son had been in his high school class, Bloom sought to question both the judge and his son under oath and asked for substitution of counsel for failing to seek the judge's recusal. At times, Bloom argues, his discussions about the anticipated penalty phase raised questions about his understanding of the nature of mitigation. For example, he expressed glee at the prospect of having Roz

Kelly, a former actor whom he had met while in jail, testify on his behalf.

Bloom argues that all this information raised a doubt as to his competence in the guilt phase. He acknowledges defense counsel's assertion that Bloom had not yet crossed the threshold of incompetence but contends the assertion must be disregarded because counsel's understanding of incompetence was at odds with constitutional standards. That is, he claims, counsel's statement that in another case counsel would have declared a doubt "eons ago" was tantamount to saying that Bloom was presently incompetent, but in this particular case counsel did not need him to be otherwise. In any event, he contends, counsel's belief did not eliminate the trial court's independent obligation to initiate competency proceedings in the face of substantial evidence objectively raising a reasonable doubt regarding Bloom's competence.

We disagree with Bloom that, on these facts, the trial court was required to declare a doubt under Penal Code section 1368 before or during the guilt phase of the retrial. "To raise a doubt . . . we require more than 'mere bizarre actions' or statements, or even expert testimony that a defendant is psychopathic, homicidal, or a danger to him- or herself and others. [Citations.] . . . [Citation.] Defendant's trial demeanor is relevant to, but not dispositive of, the question whether the trial court should have suspended proceedings under section 1368." (*People v. Mickel* (2016) 2 Cal.5th 181, 202.) Although the trial court was aware that Bloom had a history of mental illness and although the court observed occasional odd behaviors, neither fact, without more, gave rise to a duty to suspend proceedings and conduct a formal evaluation of Bloom's ability to understand the proceedings against him and assist

29

rationally in his own defense. (See *ibid.*; *People v. Blair* (2005) 36 Cal.4th 686, 714.) Nor, contrary to Bloom's argument, did the trial court have a duty to inquire into Bloom's psychiatric medication, at least absent any evidence that defendant's competence hinged on compliance with a medication regimen. (Cf. *People v. Rodas* (2018) 6 Cal.5th 219, 235.)[8]

Bloom relies heavily on the expert declarations presented in support of the pretrial motion to exclude the Medrano and Waller testimony, which opined that Bloom had been incompetent at the original trial. The jury at that trial had determined otherwise. But in any event, the declarations opined that Bloom had been incompetent more than a decade before the retrial; they did not opine on Bloom's present ability to understand the proceedings against him or consult rationally with his attorneys. Notably, several of these same experts examined Bloom again in advance of retrial to assess the validity of a possible sanity defense, and none opined that Bloom was at that time incompetent to stand trial. This case is thus unlike *People v. Wycoff* (2021) 12 Cal.5th 58, in which an expert who was "appointed to address defendant's competence to represent himself . . . also addressed, in detail, defendant's competence to stand trial," declaring him to be incompetent. (*Id.* at p. 76; see *id.* at p. 78.) There, we held that contemporaneous

---

[8] To the extent Bloom may be understood to suggest that Dr. Mills's testimony diagnosing him with Asperger Syndrome obligated the trial court to appoint the director of the regional center to evaluate him under Penal Code section 1369, he is mistaken; such an obligation arises only when a doubt regarding a defendant's competence exists and the court suspects the defendant has a developmental disability. (Pen. Code, § 1369, subd. (a)(3); *People v. Sattiewhite* (2014) 59 Cal.4th 446, 466.)

expert opinion constituted substantial evidence of incompetence, such that the court abused its discretion by failing to suspend proceedings. (*Id.* at p. 88.) Here, where several experts evaluated Bloom before the retrial and none concluded that he was incompetent, we cannot say the court abused its discretion by failing to suspend proceedings.

Finally, in multiple discussions of the issue, defense counsel declined to raise a doubt about Bloom's present competence, even as counsel acknowledged the issue was close and that he might raise such a doubt in the future. Bloom argues that defense counsel may have misunderstood the relevant standard, at one point suggesting that a doubt would have been declared "eons ago" in a different case. What counsel meant by this statement is, in context, ambiguous. Certainly, if counsel was suggesting that whether to declare a doubt was affected by the "type of case" or the nature of the work needed for counsel to prepare a defense, the suggestion was incorrect. It was Bloom's ability to assist, not counsel's need for assistance, that mattered. (See, e.g., *People v. Mickel*, *supra*, 2 Cal.5th at p. 202 ["[T]he focus of the competence inquiry is on a defendant's understanding of the criminal proceedings against him or her and the ability to consult with counsel or otherwise assist in his or her defense"].) But counsel did not elaborate on the comment, leaving its import unclear.[9] Counsel did, however, clearly decline to raise a doubt about Bloom's present incompetence. And although counsel raised concerns about the possibility that

---

[9] We have not been asked to, and do not, evaluate whether counsel's potential misapprehension of the standard constituted ineffective assistance; as we have previously noted, such questions are best left to resolution on habeas corpus. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267.)

Bloom would not be able to rationally consult with his attorneys in the future, counsel also acknowledged those concerns had not yet been realized. Under those circumstances, the court was not obligated to suspend proceedings.

### c. *Sanity phase*

Bloom next contends the trial court should have suspended proceedings during the sanity phase. Bloom had absented himself from the sanity phase proceedings. On the day the jury began to deliberate about whether Bloom was insane at the time of the capital crimes, defense counsel Applebaum told the court there had been "substantial changes in the last couple of days with Mr. Bloom" that led him to declare a doubt regarding his competence to stand trial. At that point, Bloom contends, the court had before it other substantial evidence raising a doubt regarding his competence, including his decision to absent himself from the sanity phase and Dr. Vicary's guilt phase testimony to the effect that Bloom was more likely than a normal person to suffer a breakdown or "snap" under stressful circumstances such as a criminal trial. Hearing experts testify he was mentally ill — a proposition he adamantly denied — might exacerbate the stress.

In response to counsel's declaration of doubt, the trial court stated that Bloom's ability to cooperate with counsel was unimportant at the time because "[w]e are merely waiting for the verdict to come in the sanity phase." Bloom contends the court's response was both legally and factually wrong. Bloom argues that as a matter of law, a doubt about competence can arise during jury deliberations. And as a factual matter, Bloom argues, his ability to cooperate with counsel would soon become crucial when, after seven days of deliberations, the jury was

unable to reach a sanity verdict on counts 2 and 3, the killings of Josephine and Sandra; at that point, his inability to rationally consult with counsel led him to irrationally withdraw his plea of not guilty by reason of insanity.

We agree with Bloom that doubt can arise during deliberations. But the alleged harms Bloom identifies occurred after deliberations had concluded, at a point when it would have been clear to all that his competence did in fact matter. The trial court was under an unquestioned continuing obligation to suspend proceedings if it harbored a doubt as to Bloom's competence — an obligation it surely understood — and yet the court did not do so. When a court harbors a doubt about the defendant's competence, Penal Code section 1368 requires the court to solicit defense counsel's opinion on the matter and to hold a competency hearing if counsel informs the court the defendant may not be competent. (Pen. Code, § 1368, subds. (a) & (b).) But as we have previously explained, there is no similar obligation if the court harbors no such doubt; the court is "under no duty to hold a competency hearing based solely on counsel's opinion that defendant might be incompetent." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1112.)

The court was by this point in the trial quite familiar with Bloom, who had addressed the court cogently and at length about sanity phase decisions. Against these opportunities for observation, defense counsel Applebaum cited no specific aspects of Bloom's behavior or communications that prompted him to declare a doubt, nor did he intimate that in invoking Penal Code section 1368 he was relying on any new expert evaluations of his client. Dr. Vicary's testimony, on which Bloom now relies, did not constitute an opinion that Bloom was presently incompetent or would necessarily become so. And to

the extent Bloom now relies on his subsequent decision to withdraw his insanity plea after the sanity phase mistrial, at the time Bloom gave a facially rational basis for his decision: that a retrial would require the case be transferred to a different department, with a different judge. While the insanity plea and trial may have highlighted tensions between Bloom and his attorneys, leading to Bloom absenting himself from that phase of trial, no competency hearing is required when a "defendant's lack of cooperation" arises from unwillingness rather than inability. (*People v. Lewis* (2008) 43 Cal.4th 415, 526.) In sum, nothing in the sanity phase presented the court with substantial evidence of incompetence; in the absence of such evidence, we cannot conclude the trial court erred in allowing criminal proceedings to continue despite counsel's stated doubts about the recent deterioration of Bloom's mental state.

## B. Guilt Phase Issues

### 1. *Sixth Amendment right of autonomy over the defense*

Bloom willingly conceded that he killed Bloom, Sr. But before trial, Bloom repeatedly objected to his attorneys' plan to concede Bloom also killed Josephine and Sandra, and to pursue a mental capacity defense as to all three killings. Despite Bloom's objections, at trial defense counsel told the jury that Bloom killed the three victims, but argued Bloom's mental state rendered those actions manslaughter, not first degree murder. Bloom argues that counsel's concessions violated his Sixth Amendment right of autonomy over the defense under *McCoy v. Louisiana, supra*, 584 U.S. ___ [138 S.Ct. 1500] (*McCoy*). We agree in part: counsel's decision to concede Bloom killed Josephine and Sandra, despite Bloom's insistence to the contrary, violated Bloom's right to determine the objectives of

the defense and maintain complete innocence as to these counts. But we disagree as to the killing of Bloom, Sr., for which Bloom consistently accepted responsibility. Once Bloom agreed to admit he killed his father, how best to secure acquittal or conviction of a lesser offense was a tactical matter vested with counsel.

Throughout pretrial proceedings, Bloom made known his discontent with both of his appointed attorneys, moving to substitute or relieve counsel numerous times under *Marsden* and *Faretta*.[10] Bloom's chief complaint was that he did not want to present a mental defense, but he also objected to his attorneys' plan to concede guilt as part of this strategy. He repeatedly told the court that he would admit to fatally shooting his father. But he refused to admit to killing Josephine and Sandra. He took the view that the prosecution's evidence was weak, and he preferred to put the prosecution to its proof.

Bloom did not succeed in either relieving counsel or altering counsel's strategy. During opening statement, lead defense counsel Applebaum told jurors: "The evidence . . . is going to show you that [Bloom] killed his father, he killed Josephine and he killed Sandy." Counsel argued that the killings were manslaughters because Bloom acted in the heat of passion when killing his father, who was "a horrible excuse for a human being." Bloom then "descended into the depths of madness" and killed Josephine and Sandra but was incapable of deliberate thought when he did so. Counsel argued: "We will prove to you [Bloom] committed manslaughters and he should be held responsible for what he did." Returning to the same

---

[10]  *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

theme, counsel told the jurors Bloom should not be convicted of murdering Josephine and Sandra because "the mental states required for murder are not there. [¶] Yes, he should be held responsible for killing them. He did it. Manslaughter, an intentional killing, he did it."

During closing argument, defense cocounsel Tonya Deetz again referenced Bloom's responsibility for the killings, telling jurors, "You will find him guilty." She went on, "You will find [Bloom] criminally responsible for three homicides. That is a fact. [¶] He killed three people. It is neither excused nor justified." Deetz told jurors they could find Bloom "guilty of anything [they] want, Josephine and Sand[y] will still be dead." "One issue you don't have to fool around with is did he do it, didn't he do it," Deetz argued, because there was "[t]ons of direct evidence that he killed these people." Applebaum later reiterated, "He is guilty and you will find him guilty. The question is what is he guilty of. Murder or another type of homicide?" He also informed jurors that Bloom was "guilty of something," and noted "in some ways that takes away from the presumption of innocence." Finally, he urged the jury to conclude Bloom "is guilty of involuntary manslaughter as to Josephine and Sand[y] because of his mental illness, this dissociation."

Bloom claims that his attorneys violated his autonomy-based right to determine the objective of his defense, guaranteed by the Sixth Amendment to the United States Constitution, by conceding over his objection that he was responsible for killing Josephine and Sandra and by presenting a mental state defense to all three charged crimes. His argument relies on *McCoy*, *supra*, 138 S.Ct. 1500, which considered "whether it is unconstitutional to allow defense counsel to concede guilt over

the defendant's intransigent and unambiguous objection" and answered that question in the affirmative. (*Id.* at p. 1507.)

In *McCoy*, the defendant shot and killed his estranged wife's mother, stepfather, and son in their home. (*McCoy*, *supra*, 138 S.Ct. at pp. 1505–1506.) McCoy was indicted on three counts of first degree murder but maintained he was not involved in the killings because he was out of state and the victims were instead killed by corrupt police officers following a drug deal. (*Id.* at p. 1506.) In light of "overwhelming" evidence tying his client to the murders, McCoy's retained counsel, Larry English, decided the best strategy to avoid a death sentence was to concede McCoy's guilt (*ibid.*) and appeal to the jury's mercy in view of McCoy's " 'serious mental and emotional issues' " (*id.* at p. 1507). McCoy, however, was " 'complet[ely] oppos[ed] to [his attorney] telling the jury that [he] was guilty of killing the three victims.' " (*Id.* at p. 1506.) Given English and McCoy's differences concerning what strategy to pursue, McCoy sought to substitute counsel two days before trial. (*Ibid.*) The court denied that request and instructed English that it was his role to " 'make the trial decision' " about whether to concede his client's guilt. (*Ibid.*) As he had indicated he would, English conceded McCoy's guilt of the three murders during the guilt phase opening statement, telling jurors "there was 'no way reasonably possible' that they could hear the prosecution's evidence and reach 'any other conclusion than Robert McCoy was the cause of these individuals' death[s].' " (*Ibid.*) The jury returned three death verdicts, and the Louisiana Supreme Court affirmed, concluding defense counsel had authority to concede guilt over the defendant's opposition. (*Id.* at p. 1507.)

The United States Supreme Court reversed, holding English's concession violated McCoy's right, grounded in the

Sixth Amendment, to "decide that the objective of the defense is to assert innocence." (*McCoy*, *supra*, 138 S.Ct. at p. 1508.) The court distinguished for these purposes between the types of decisions that counsel ordinarily may make unilaterally and those defendants are entitled to make for themselves. The court explained: "Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' [Citation.] Some decisions, however, are reserved for the client — notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." (*Ibid*.) The court concluded that "[a]utonomy to decide that the objective of the defense is to assert innocence belongs in this latter category": "Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, . . . so may she insist on maintaining her innocence at the guilt phase of a capital trial." (*Ibid*.) Put differently: "When a client expressly asserts that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." (*Id*. at p. 1509.)

Bloom argues this case is controlled by *McCoy*. We agree with respect to the counts arising from the deaths of Josephine and Sandra. Defense counsel conceded, over Bloom's objection, both that Bloom killed Josephine and Sandra and that Bloom should be held criminally liable for the killings. Counsel's decision to concede Bloom's guilt on these counts cannot be squared with a rule that gives the criminal defendant the right to "oppos[e] . . . any admission of guilt" (*McCoy*, *supra*, 138 S.Ct.

at p. 1507) and instead "pursue acquittal" as the object of the representation (*id.* at p. 1506).

It is true that counsel here argued Bloom should be held liable only for lesser offenses than the first degree murder charges he faced. Counsel undoubtedly had sound reasons for making these concessions; in view of the evidence, counsel may well have concluded the best possible outcome of the proceedings was one that would reduce the severity of Bloom's likely punishment. But even so, counsel's concessions were incompatible with Bloom's objective to instead maintain innocence and pursue acquittal. And as *McCoy* instructs, the decision about what objective to pursue was Bloom's to make.

Indeed, the *McCoy* opinion addressed this very scenario, citing with approval a number of state cases holding that counsel may not unilaterally pursue a strategy of "concession of the defendant's commission of criminal acts and pursuit of diminished capacity, mental illness, or lack of premeditation defenses." (*McCoy*, *supra*, 138 S.Ct. at p. 1510.)[11] These cases, as the high court described them, "were not strategic disputes about whether to concede an element of a charged offense, [citation]; they were intractable disagreements about the fundamental objective of the defendant's representation." (*McCoy*, at p. 1510.) This was so because the unavoidable

---

[11] For example, in *People v. Bergerud* (Colo. 2010) 223 P.3d 686, cited with approval by *McCoy*, *supra*, 138 S.Ct. at page 1510, the Colorado Supreme Court considered whether defense counsel had, "by focusing on [defendant's] mental state, . . . effectively pled him guilty to lesser homicide crimes against his wishes," conduct that in its view "would have overstepped their bounds and appropriated fundamental choices committed to the defendant's decision alone." (*Bergerud*, at p. 697.)

consequence of counsel's strategy in those cases was to abandon the defendant's wish to pursue acquittal in favor of a strategy that would concede criminal responsibility of a lesser crime in order to seek lesser punishment. In characterizing this choice as going to the fundamental objective of the defendant's representation, *McCoy* makes clear that the decision whether to concede the defendant should be found guilty of a crime — even a lesser crime than the one the prosecution charged — is a decision that necessarily belongs to the defendant. (See also *People v. Flores* (2019) 34 Cal.App.5th 270, 273, 275 [finding *McCoy* error where counsel conceded killing and argued absence of premeditation over the defendant's objection];[12] *People v. Eddy* (2019) 33 Cal.App.5th 472, 477 [finding *McCoy* error where counsel conceded guilt of manslaughter over client's objection]; *State v. Horn* (La. 2018) 251 So.3d 1069, 1072–1074 [finding *McCoy* error where counsel conceded capital defendant was guilty of second degree murder or manslaughter over defendant's objection].)

The Attorney General does not dispute that *McCoy* forbids counsel from conceding guilt of the charged offense or lesser included offenses despite the client's wish to maintain innocence. He instead argues *McCoy* is inapplicable because the core of Bloom's objection was not, in fact, a wish to maintain innocence, but instead a wish to avoid a mental capacity defense and a wish to test gaps in the prosecution's evidence that he killed Josephine and Sandra. Given the nature of Bloom's

---

[12] This case raises no question about the application of the Sixth Amendment to other types of concessions falling short of a concession of guilt, such as concession of certain elements of a charged offense. (See *People v. Flores*, *supra*, 34 Cal.App.5th at pp. 280–283.) We express no views on the subject.

objection, the Attorney General contends that counsel's decision to concede guilt was the sort of strategic judgment that falls within counsel's prerogative under *McCoy*.

With regard to Josephine and Sandra, the record belies the premise of the argument: Bloom clearly objected to admitting responsibility for the two victims' deaths. It is true that he was not always adamant on this point; in an initial *Marsden* hearing, for example, he seemed to suggest that he ought to be entitled to reduce his convictions from first degree murder because he did not premeditate the murders, without mentioning that he either believed himself to be innocent or that he wished for his counsel to maintain his innocence on retrial. But Bloom would later inform the court and counsel, in unmistakable terms, that he did not want to admit to killing Josephine or Sandra. He said: "[Defense counsel], over my objection and against my express wishes, is going to concede guilt in this case and I find that to be intolerable and outrageous." Even considering these statements in the broader context of Bloom's opposition to the mental defense strategy, there is nothing genuinely ambiguous about his expressed desire to maintain innocence in the deaths of Josephine and Sandra.[13] Counsel nonetheless conceded that Bloom was factually responsible for the deaths of Josephine and Sandra,

---

[13] The Attorney General notes that at the first trial, Bloom disputed that he killed Josephine, but did not dispute that he killed Sandra. The Attorney General does not suggest, however, that Bloom affirmatively admitted to killing Sandra. (Cf. *People v. Bloom*, *supra*, 48 Cal.3d at p. 1207 [Bloom testified at trial that he saw Sandra after shooting Bloom, Sr., pulled the trigger on the rifle, and " 'the next thing that happened' was that he was arrested while walking"].)

and while he did not commit first degree murder, he should still be held criminally liable for their deaths. This decision was certainly understandable as a matter of trial strategy. But under *McCoy*, Bloom's clearly expressed objection should have controlled.

We agree with the Attorney General, however, that there was no *McCoy* violation in connection with the Bloom, Sr., murder charge, as to which Bloom conceded his responsibility. And although Bloom cursorily argues otherwise, counsel's presentation of a mental capacity defense on this count, in the absence of a clearly objected-to admission of criminal liability, did not give rise to a Sixth Amendment violation. *McCoy* explained the point as follows: "If, after consultations with English concerning the management of the defense, McCoy disagreed with English's proposal to concede McCoy committed three murders, it was not open to English to override McCoy's objection. English could not interfere with McCoy's telling the jury 'I was not the murderer,' although counsel could, if consistent with providing effective assistance, focus his own collaboration on urging that McCoy's mental state weighed against conviction." (*McCoy*, *supra*, 138 S.Ct. at p. 1509.) Here, the case was retried precisely because the Ninth Circuit found Bloom's counsel at his first trial ineffective for failing to effectively develop a mental state defense. (*Bloom v. Calderon*, *supra*, 132 F.3d at pp. 1271–1278.) The decision to pursue a defense strategy focused on the role Bloom's mental health played in the crimes was strongly indicated, if not outright compelled, by the Ninth Circuit's decision. So here, where Bloom did not contest his responsibility for killing his father, Bloom, Sr., at the retrial, counsel did not violate the Sixth Amendment by presenting a mental state defense to first degree

murder, even though Bloom did not wish for counsel to present the defense.[14]

Having found error as to two of the murder counts, we consider the appropriate remedy. In *McCoy*, the court reversed the judgment without an inquiry into harmlessness. It concluded that the autonomy rights violated by counsel's unilateral decision to concede his client's guilt of first degree murder fell within that category of rights that are "so basic to a fair trial that their infraction can never be treated as harmless error." (*Chapman v. California* (1967) 386 U.S. 18, 23 (*Chapman*).) The court likened the violation in the case to a violation of a defendant's right of self-representation, explaining " '[t]he right is either respected or denied; its deprivation cannot be harmless.' " (*McCoy, supra*, 138 S.Ct. at p. 1511.) Like the deprivation of that right, the court concluded counsel's erroneous concession of guilt of first degree murder was a "structural" error that could be corrected only by holding a new trial. (*Id*. at p. 1512.) Bloom argues that here, too, the error is structural and requires us to reverse the judgment in its entirety.

We agree that the *McCoy* error requires reversal of the affected counts and associated allegations but disagree that it

---

[14]    We note that the decision whether to present a mental capacity defense differs from the decision whether to present a defense of not guilty by reason of insanity. While a mental capacity defense may mitigate criminal culpability, an insanity defense could result in indefinite commitment to a mental institution. For this reason, under long-standing California law, a presently sane defendant must be permitted to make the decision whether to mount an insanity defense. (*People v. Gauze* (1975) 15 Cal.3d 709, 717–718.)

requires reversing the judgment in its entirety. In *McCoy*, it made sense to reverse the judgment on all counts because the error affected the entire defense: McCoy wished to maintain his innocence of all three murder counts, and counsel conceded his guilt on all three counts. Here, by contrast, Bloom wished to maintain his innocence on only two of the three counts. As noted, throughout the proceedings, Bloom acknowledged that he shot his father to death and clearly told the court and counsel that he had no objection to saying so. There is no reasonable possibility that counsel's erroneous concessions with respect to the other counts affected the jury's consideration of the count concerning the murder of Bloom, Sr. There is, therefore, no reason why the jury's verdict with respect to the murder of Bloom, Sr., should not stand. (See, e.g., *People v. Reese* (2017) 2 Cal.5th 660, 671.)

By contrast, counsel's decision to concede Bloom's criminal responsibility for the deaths of Josephine and Sandra over Bloom's objection is error of the sort that, as *McCoy* instructs, defies harmlessness review. As the *McCoy* court explained: "Such an admission blocks the defendant's right to make the fundamental choices about his own defense. And the effects of the admission would be immeasurable, because a jury would almost certainly be swayed by a lawyer's concession of his client's guilt." (*McCoy*, *supra*, 138 S.Ct. at p. 1511.) Bloom "must therefore be accorded a new trial" on the affected counts "without any need first to show prejudice." (*Ibid.*)

This conclusion requires us to reverse Bloom's convictions on counts 2 and 3, concerning the murders of Josephine and Sandra, as well as the associated firearm- and weapon-use allegations. The reversal of two of the three charged murder convictions also requires us to reverse the jury's true finding on

the only special circumstance alleged here, multiple murder. And this, finally, requires us to reverse the death judgment, which cannot stand in the absence of a valid special circumstance finding. (See *People v. Trujeque* (2015) 61 Cal.4th 227, 253.)

### 2. *Admission of witnesses' former testimony*

Witnesses Martin Medrano and Christine Waller testified at Bloom's first trial but were unavailable on retrial. The trial court allowed the prosecution to introduce their former testimony under Evidence Code section 1291.[15] Bloom contends this was error that violated both the Evidence Code and his federal constitutional rights. We reject the argument.

In his testimony as read to the jury on retrial, Medrano testified that in April 1982, three or four days before the homicides, Bloom asked Medrano to get him a handgun, offering

---

[15] Evidence Code section 1291 provides: "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] (1) The former testimony is offered against a person who offered it in evidence in his own behalf on the former occasion or against the successor in interest of such person; or [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing. [¶] (b) The admissibility of former testimony under this section is subject to the same limitations and objections as though the declarant were testifying at the hearing, except that former testimony offered under this section is not subject to: [¶] (1) Objections to the form of the question which were not made at the time the former testimony was given. [¶] (2) Objections based on competency or privilege which did not exist at the time the former testimony was given."

$1,200 and mentioning he had a contract to kill someone. A few days later, Bloom told Medrano he would read about the killing, but never produced any money to buy a gun. When Medrano heard about the crime, he did not immediately come forward because he was in violation of his parole. At the time of his testimony, he was in custody for armed robbery, but testified he had not been promised anything for his testimony.

Waller was 14 years old in April 1982 and 16 when she testified at Bloom's first trial. At the time of the killings, she had known Bloom for about two years. They had a close relationship, and he would often stay overnight at her house. Sometime in April, Bloom told her there had been an attempted break-in at Waller's house and that he would stay at the home to protect the family. Two nights before the killings, Bloom told her to stay indoors, and she saw him outside the house carrying her brother's rifle. On the day before the killings, Bloom was again staying at her house. When Waller went to wake him at 5:00 the next morning, he was not in his room. Waller also testified to Bloom's antagonistic relationship with his father, who was always angry at him, and his caring relationship with his stepsister Sandra.

The defense sought to exclude this testimony from being presented in the retrial. The defense contended that the prior testimony was inadmissible under Evidence Code section 1291 because Bloom had not had "the right and opportunity to cross-examine the declarant[s] with an interest and motive similar to that which" he now had at the retrial, as section 1291 requires. (Evid. Code, § 1291, subd. (a)(2).) He contended this was so for several reasons: Because his former counsel missed important points in their cross-examination of the two witnesses, failing to probe Medrano's motivations to lie as well as Waller's

observations of Bloom's mental illness and relationships with family members; because former counsel had been found constitutionally ineffective; and because Bloom was incompetent at the time of the first trial. To support this last point, counsel relied on evidence developed in federal habeas corpus proceedings, including a neurological assessment and jail records evidencing Bloom's bizarre behavior, delusions and hallucinations, and a suicide attempt, as well as various expert reports. Dr. Hyman Weiland, who had testified at the first trial that Bloom was incompetent, reviewed the additional evidence and gave a declaration stating he adhered to his previously expressed views. Dr. William Vicary, who had testified at the first trial that Bloom was competent, declared he now believed Bloom had been incompetent at the first trial based on reviewing additional materials and interviewing Bloom again. Drs. Julian Kivowitz, David Lisak, and Donald Verin also submitted declarations agreeing that Bloom had not been competent during his previous trial. Based on this evidence, counsel argued that a retrospective competency hearing was needed to determine whether the prior testimony of Medrano and Waller was admissible. (See *People v. Lightsey* (2012) 54 Cal.4th 668, 703–711 [discussing nature and feasibility of retrospective competency proceedings].)

The prosecutor opposed the motion. She noted that when the Ninth Circuit found Bloom had received ineffective assistance of counsel at his first trial, the court did not fault former counsel's handling of the lay witnesses, instead reserving its criticism for his investigation and presentation of the expert mental health witnesses. She also asserted that prior counsel may have had tactical reasons for handling the lay witnesses as he did, such as to avoid emphasizing that Medrano knew Bloom

from jail. Agreeing with the prosecutor, the trial court declined to exclude the challenged testimony of Medrano and Waller.

We affirm the relevant rulings. The possibility that current counsel would have cross-examined a witness differently or more searchingly does not, in itself, render the prior testimony inadmissible under Evidence Code section 1291. (*People v. Zapien* (1993) 4 Cal.4th 929, 975 ["As long as defendant was given the opportunity for effective cross-examination, the statutory requirements were satisfied; the admissibility of this evidence did not depend on whether defendant availed himself fully of that opportunity"].)

It is true that former defense counsel's ineffective assistance can, in some circumstances, be grounds for excluding an unavailable witness's prior testimony on constitutional grounds. In past cases, we have looked to "the circumstances surrounding the prior testimony and how it was used in the subsequent trial[] to determine whether the evidence at issue is attributable to counsel's ineffective assistance and whether its use denied the defendant a fair trial in the subsequent proceeding." (*People v. Ledesma* (2006) 39 Cal.4th 641, 686–687; see also *Crawford v. Washington* (2004) 541 U.S. 36, 57 [for purposes of the confrontation clause, former testimony is admissible if the defendant had an adequate opportunity to examine the witness at the prior hearing], citing, inter alia, *Mancusi v. Stubbs* (1972) 408 U.S. 204, 215 [confrontation clause did not bar use of a witness's prior testimony on retrial following reversal of a conviction for ineffective assistance of former counsel where the defense proffered no "new and significantly material line of cross-examination that was not at least touched upon in the first trial"].)

Here, however, Bloom makes no persuasive showing that the trial court should have excluded the Medrano and Waller testimony due to deficiencies in prior counsel's cross-examination. As for Medrano, the prosecutor elicited on direct examination the facts of Medrano's criminal record and heroin addiction and that he had been promised nothing for his testimony. Trial counsel then cross-examined him regarding the effects of his drug use and the reasons for his delay in reporting his encounters with Bloom. The cross-examination gave the jury ample basis to question Medrano's veracity. Bloom's argument that further cross-examination would have provided the jury with additional reasons to doubt his testimony is not sufficient reason to bar the introduction of Medrano's testimony on retrial. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1174 [as long as the defendant was given the opportunity for cross-examination, admission of preliminary hearing testimony under Evid. Code, § 1291 does not violate the confrontation clause " 'simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective,' " quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 851].) As for Waller, defense counsel elicited on cross-examination her belief that Bloom, Sr., bullied Bloom, her characterization of Bloom's good relationships with Josephine and Sandra, her observations of Bloom, Sr., losing his temper at Bloom, and her recollection of Bloom's demeanor on the night of the offenses. The suggestion that former trial counsel, if sufficiently prepared, could have elicited from this teenage witness further information significantly bearing on Bloom's mental state at the time of the offenses is speculative at best. While it is always possible to conceive of additional questions that could have been asked, former trial counsel's

cross-examination of Medrano and Waller was not so deficient that fairness required excluding their former testimony at Bloom's retrial.

As noted, Bloom alternatively sought exclusion of the Medrano and Waller testimony based on information developed in his federal habeas corpus proceedings that suggested he was incompetent during his prior trial. He contends that because he was incompetent, he did not have the adequate opportunity to cross-examine the witnesses that the Constitution requires.

Bloom's argument relies on *Stevenson v. Superior Court* (1979) 91 Cal.App.3d 925, 929–931. There, the defendant was held to answer following a preliminary hearing. It was later determined that the defendant was incompetent at the time of the hearing. After the defendant was restored to competency, a second preliminary hearing was held. At that hearing, the prosecution presented, over defense objection, the prior testimony of the now-unavailable victim, and the defendant was again held to answer. (*Id.* at pp. 927–928.) The Court of Appeal ordered the information set aside for lack of supporting evidence. The court concluded the victim's prior testimony was inadmissible because the defendant lacked an adequate opportunity to cross-examine the victim by reason of his incompetence during the initial preliminary hearing. (*Id.* at pp. 930–931.) Although the defendant had been represented by counsel at the time, the appellate court nonetheless declined to presume the incompetent defendant enjoyed a meaningful opportunity for cross-examination. (*Id.* at p. 930.)

The Attorney General urges us not to follow *Stevenson*, contending that Bloom's asserted incompetence at his first trial should not affect admissibility of the prior testimony unless it

demonstrably impaired the defense cross-examination of the witnesses at the first trial. But we need not decide here whether to adopt the reasoning of *Stevenson*, since the premise of the holding in that case is absent: Unlike the defendant in *Stevenson*, Bloom was never found to be incompetent at the time the witnesses were examined at the first trial. As noted above, the issue of Bloom's competency was raised and litigated at the first trial, and Bloom was found competent. The issue arose around the time of sentencing, after he had been granted self-representation under *Faretta*, *supra*, 422 U.S. 806. While preparing for his sentencing, Bloom stabbed a fellow jail inmate. The trial court revoked his self-representation status, reappointed counsel, and ordered psychiatric evaluations and a competency hearing before a jury, which found him competent. (*People v. Bloom*, *supra*, 48 Cal.3d at p. 1217.) The trial court then restored his self-representation status and sentenced him to death. In reversing Bloom's conviction and sentence, the federal court did not address any questions relating to his competency. (See *Bloom v. Calderon*, *supra*, 132 F.3d 1267.)

On appeal, Bloom contends this was error; he maintains that the court should have held a retrospective competency hearing before ruling on the admissibility of Medrano's and Waller's former testimony. We conclude that the trial court did not err. While Bloom did amass additional evidence to support his argument that he was incompetent at the first trial, the court could reasonably weigh the retrospective opinions of medical professionals — rendered some nine years after trial — against the *contemporaneous* opinions of the professionals who had taken the view that Bloom was competent. As our cases have explained, there are often substantial obstacles to holding retrospective competency hearings — at which the defendant

51

bears the burden of proving incompetence — even in cases in which competence to stand trial is directly at issue. (See, e.g., *People v. Wycoff, supra,* 12 Cal.5th at pp. 93–96.) Here, the trial court did not err in declining to hold a retrospective competency hearing for the limited purpose of determining whether to admit the prior testimony of two witnesses who were, as explained above, effectively examined at the first trial.[16]

The trial court did not, in short, err in overruling Bloom's evidentiary objection.

### 3. *Cross-examination of Dr. Watson*

Bloom contends the trial court violated his rights under the state and federal Constitutions by allowing cross-examination of the defense neuropsychological expert concerning Bloom's behavior and demeanor in the courtroom. We are unpersuaded.

The issue arose in the following context. Dr. Watson twice conducted neuropsychological testing of Bloom, first in 1993 and again from 1999 to 2000. Dr. Watson testified as to what the testing revealed about Bloom's cognitive capacities, deficits, and functioning and how they may have affected the commission of the crimes. On cross-examination, over a defense objection, Dr. Watson acknowledged that his report stated Bloom appeared to meet one of the criteria (Category A) for Asperger Syndrome as detailed in the Diagnostic and Statistical Manual of Mental Disorders: "marked impairment in the use of multiple nonverbal behaviors such as eye to eye gaze, facial expression,

---

[16] This is true regardless of whether the trial court was bound by, or simply considered, the outcome of the competency proceedings at the first trial.

body postures, and gestures to regulate social interaction." The prosecutor then asked, "Hypothetically, if the defendant were to sit in the courtroom and make good eye contact with his defense attorneys and their assistant, and to watch the witnesses testify, and to then talk to his attorney, and then go back to watching the witness testify, would that tend to not be part of the Criteria A?" Defense counsel objected that the question was an improper hypothetical and lacked foundation, but the prosecutor said she had been watching and "it is absolutely true," and that her expert had been in the courtroom for three days and would testify it was true. The court noted it had "observed eye-to-eye contact" and "numerous facial expressions," and concluded the question was therefore proper. Defense counsel moved for a mistrial, arguing that comment on communication between Bloom and his defense team violated the attorney-client privilege. The court denied the motion. The prosecutor resumed cross-examining Dr. Watson, asking, "Hypothetically, if the defendant is sitting next to the . . . woman that's sitting next to him making eye contact, smiling, gesturing with his hands, nodding up and down, speaking to her, she is speaking back to him, does that tend to tell you that we haven't met" the Asperger criterion? Dr. Watson conceded, "That would tend to argue against that."

Bloom contends that his demeanor during the guilt phase of trial was legally irrelevant and not a proper subject for cross-examination, since Dr. Watson had never diagnosed him with Asperger Syndrome, and Dr. Mills, who had, did not explicitly determine whether the disputed criterion applied. He contends the prosecutor's questions were improper for the additional reason that testimony or comment about the demeanor and behavior of Bloom and defense counsel during their courtroom

interactions invited improper speculation about privileged matters.

The trial court did not abuse its discretion in permitting the questioning. As a general matter, a nontestifying defendant's courtroom demeanor in the guilt phase of a capital trial is legally irrelevant and the prosecutor may not comment on it. (*People v. Heishman* (1988) 45 Cal.3d 147, 197 ["In criminal trials of guilt, prosecutorial references to a nontestifying defendant's demeanor or behavior in the courtroom have been held improper" on various grounds, including that "[c]onsideration of the defendant's behavior or demeanor while off the stand violates the rule that criminal conduct cannot be inferred from bad character"].) But by offering expert opinion on Bloom's neuropsychiatric condition, the defense put in issue aspects of his behavior that shed light on the existence of that condition. (See *ibid.* [rejecting claim of error on the basis that the prosecutor's references to the defendant's demeanor were made during the penalty phase of a trial in which the defendant had placed his own character in issue].) Dr. Watson acknowledged stating in his report that Bloom appeared to meet a diagnostic criterion for Asperger Syndrome, and the prosecutor could properly probe the basis for that opinion. (*People v. Hawthorne* (2009) 46 Cal.4th 67, 93–94.)[17] The challenged questioning did not implicate the concerns underlying the general rule against using a defendant's courtroom demeanor as impermissible bad character evidence.

---

[17] In reaching this limited conclusion here, we are not suggesting that the prosecution is free to comment on a defendant's courtroom behavior or demeanor anytime the defense places a defendant's mental state in issue.

Nor, in view of the absence of any revelation of the content of communications between Bloom and his defense team, did the questioning infringe the attorney-client privilege or violate his right to privacy.

### 4. *Prosecutorial misconduct*

Bloom asserts the prosecutor engaged in several instances of improper argument and cross-examination during the guilt phase. He argues these instances of misconduct violated his federal and state constitutional rights, as well as Penal Code section 1180, and require reversal of the judgment. "Prosecutorial misconduct requires reversal when it 'so infect[s] a trial with unfairness [as to] create a denial of due process. [Citations.] Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury.'" (*People v. Armstrong* (2019) 6 Cal.5th 735, 795.) We find no reversible misconduct here.

### a. *Use in opening statement of Bloom's remarks in closing argument at his first trial*

Before trial, the prosecution asked the court to permit it to introduce Bloom's penalty phase closing argument from his first trial, in which he described thinking about killing his father weeks before the murder occurred. The defense objected, citing Penal Code section 1180, which states that "[t]he granting of a new trial places the parties in the same position as if no trial had been had," and "[a]ll the testimony must be produced anew." (Pen. Code, § 1180.) Notwithstanding the objection, Judge Hoff ruled the prosecution could use excerpts from the closing argument. As discussed below, however, the parties dispute whether Judge Hoff's admissibility ruling was limited to use in

cross-examination of defense experts or included use in the prosecution's case-in-chief. Prosecutor Samuels had made clear her desire to introduce Bloom's closing argument in the prosecution's case-in-chief, but the rest of the admissibility discussion focused on the use of the argument in cross-examination. Specifically, Samuels argued that precluding her from using the argument excerpts would hamper her ability to "properly cross-examine" experts. The court agreed, rhetorically asking how "a court [could] preclude another party from cross-examining a witness," and noting that the impact of having Bloom's prior statement read is "precisely why [the prosecutor] wants to use it, . . . and I think the law provides for it," albeit with "some redaction."

Judge Hoff later recused himself and Judge Schempp took over the case. At a hearing shortly before trial, defense counsel asked Judge Schempp to admonish the prosecution "not to bring up in their opening statement any issues that are still contested," including "the penalty argument from the first trial by Mr. Bloom." The court stated: "She is certainly not going to get into that in the opening statement." The prosecutor asserted, "It doesn't matter, it's not contested; it's all been ruled on. Everything she's mentioned has already been ruled on." Defense counsel disagreed as to the scope of Judge Hoff's prior ruling. The court responded, "I'm not going to hear any more of this. These things have all been ruled on and Ms. Samuels knows how to make a proper opening statement on what she expects to prove."

During her guilt-phase opening statement, the prosecutor explained that she would prove that "rather than being mentally deficient, the defendant in this case was capable of formulating and did formulate a rather sophisticated plan to kill his father."

Without telling the jury the context in which Bloom made the statement, the prosecutor then quoted from Bloom's closing penalty phase argument at the first trial, at which he represented himself and asked the jury to return a death verdict: " 'This man was going to die. Weeks before this, sure, thoughts went through my head, "I'm going to kill the old man," sure. The difference is putting it into action. Eventually this man was going to die and eventually he was going to die by my hand. He just speeded up the results.' "

Defense counsel did not object at the time. Six days later, however, in a hearing outside the presence of the jury, the parties addressed defense objections under Penal Code section 1180 to the admissibility of other portions of the closing argument. At that hearing, Judge Schempp expressed discomfort with the prosecutor's having introduced Bloom's argument to the jury in the earlier trial as if it were a party admission under Evidence Code section 1220. Judge Schempp ruled, however, that the prosecutor could use the argument in cross-examining psychiatric experts.

On appeal, the parties dispute the scope of Judge Hoff's admissibility ruling as it was rendered, and which Judge Shempp had declined to reconsider before trial. Bloom contends the ruling allowed use of his prior penalty argument only to probe the basis for the defense experts' opinions when they testified, while the Attorney General asserts Judge Hoff's ruling "appeared to contemplate the admission of appellant's statements during the prosecution's case in chief," presumably as a party admission under Evidence Code section 1220.

Assuming without deciding that the prosecutor's use of Bloom's admission in her opening statement was misconduct,

we perceive no prejudice under any standard. The quote was brief, and the jury was instructed that the remarks of counsel are not evidence. Aside from the use of this quote, the record reflects overwhelming evidence that Bloom premeditated the killing of his father: Bloom spent the days leading up to the murder obtaining a gun, planning to stay at Waller's home and fabricating a break-in at that home to do so, and telephoning his father to tell him, "You're running my life now, but you won't be for long."

### b. *Cross-examination of defense expert regarding informant statements; argument concerning their reliability*

Bloom contends the prosecutor engaged in misconduct when cross-examining defense expert Dr. Mark Mills with the testimony of two jailhouse informants and making a related argument to the jury. Dr. Mills testified on direct examination that Bloom dissociated during the offenses and suffered from brain damage and Asperger Syndrome. In preparing to testify, Dr. Mills had reviewed the 1982 preliminary hearing testimony of Rodney Catsiff and Mariano Alatorre to the effect that Bloom had told them about the crime, his reasons for committing murder, the weapon he used, and the number of times he stabbed Sandra. During federal habeas corpus proceedings, however, both these informants had recanted their testimony in whole or in part, and the prosecutor noted that her office's policies would not permit her to call Catsiff and Alatorre as witnesses in the present trial. But because their testimony had been provided to Dr. Mills, the court ruled he could be questioned concerning his reliance on it.

On cross-examination, Dr. Mills disclaimed reliance on the informants' preliminary hearing testimony because of their

later recantations. The prosecutor then asked questions apparently aimed at bolstering the credibility of the informants' preliminary hearing testimony. The prosecutor asked, for example, how Catsiff could have known how many times Sandra was stabbed unless Bloom had told him, and whether Catsiff's having written notes of his conversation with Bloom suggested that he had in fact testified truthfully about it.

Bloom argues that by engaging in this line of questioning, the prosecutor improperly sought to vouch for the truth of the later-recanted informant testimony. Moreover, he contends, the prosecutor reinforced these themes in her closing argument when she asked the jury rhetorically, "[D]o you think it is reasonable that the detective in this case took these jailhouse snitches, put them on the stand and they were lying?" The Attorney General, for his part, contends the prosecutor's questions and argument complied with the trial court's ruling that Dr. Mills could be cross-examined on the topic; that the rule against vouching was not implicated here because Catsiff and Alatorre were not witnesses in the retrial; and that in any event no improper vouching occurred because the prosecutor's statements and inferences regarding their testimony were all based on matters of record.

Bloom's claim as to the prosecutor's rhetorical question in closing is forfeited by his failure to make a contemporaneous objection. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) But even if Bloom's claims of error were all preserved for appeal, we conclude that neither the prosecutor's questioning nor her argument constituted improper vouching. "The general rule is that improper vouching for the strength of the prosecution's case ' "involves an attempt to bolster a witness by reference to facts outside the record," ' " such as the prosecutor's personal

experience. (*People v. Huggins* (2006) 38 Cal.4th 175, 206.) Unlike our recent decision in *People v. Rodriguez* (2020) 9 Cal.5th 474, 481, in which we concluded that a prosecutor impermissibly vouched for testifying officers by asserting they "would not lie because each would not put his 'entire career on the line' or 'at risk,'" here — as the Attorney General correctly observes — "[a]ll of the prosecutor's questions to Dr. Mills were based on the record or on reasonable inferences that could be drawn from the record." Nor do we find the prosecutor's remarks during closing argument constitute improper vouching. In context, the rhetorical question about the witnesses lying was part of a broader theme — that to accept the defense theory about Bloom's mental state, the jury would have to ignore significant evidence, as had the defense expert. Dr. Mills, the prosecutor argued, had "disregard[ed] what doesn't fit into his diagnosis. Just that simple. The pile of stuff in this case that you have to ignore if you want to believe the defense just keeps getting bigger and bigger." "It is not . . . misconduct to ask the jury to believe the prosecution's version of events as drawn from the evidence." (*Huggins*, at p. 207.)

### c. Cross-examination of defense experts and argument regarding mental states (Pen. Code, § 29)

Bloom contends the prosecutor improperly asked defense experts to render an opinion on Bloom's mental state during the crimes.

Penal Code section 29 provides that "[i]n the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states . . . for the crimes charged. The question

as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." "[S]ections 28 and 29 . . . exclude expert testimony regarding a defendant's capacity to form a required mental state and expert testimony stating a conclusion that a defendant did or did not have a required mental state." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 117.)[18] "On the other hand, . . . questions concerning how defendant could perform certain acts without intending to do them, and whether defendant's actions indicated that he had impaired judgment, [are] not inappropriate." (*People v. Smithey* (1999) 20 Cal.4th 936, 961.)

Dr. Watson testified on direct examination concerning the results of neuropsychological testing he administered to Bloom, which in the expert's view showed long-standing brain damage resulting in "generally severe" impairment affecting his ability to process information and emotional reactions, react to new situations, and make decisions and judgments in a considered manner.

On cross-examination, the prosecutor probed matters Dr. Watson had mentioned in his report to determine whether he relied on them and if not, why not. These matters included Bloom's statement to another expert that, after the crimes, he

---

[18] Penal Code section 28, subdivision (a), provides: "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

attempted "to get rid of the evidence and leave a cold trail," as well as the fact that Josephine had been killed with three gunshots to her head and Sandra by multiple stab wounds as well as a gunshot to the face. Of the planning evidence, the prosecutor asked Dr. Watson, "Doesn't that reflect not only his ability to make that plan, but the fact that he in fact carried it out?" Of the three shots that killed Josephine, the prosecutor asked whether they "show that the defendant knew exactly what he was doing when he killed her, that he was intending to kill her," eliciting Dr. Watson's answer that "I think it probably does." And of the mode of Sandra's killing, presented in a hypothetical question, the prosecutor asked Dr. Watson, "Doctor, is this person trying to kill Sandra Hughes or not?" The prosecutor continued: "And what I'm asking you is: If every one of his behaviors starting weeks before the murder in the planning of the killings — weeks before the killings with planning and ending shortly after the murder almost finishing the plan, you are saying that the only part of that period where his mental impairments kicked in because of the emotional components is during that short period of time from when he first shot his father until when he finished killing Sandra?" Dr. Watson agreed.

Contrary to Bloom's arguments, none of this questioning violated the restrictions in Penal Code section 29. The prosecutor was entitled to test on cross-examination Dr. Watson's opinion that brain damage precluded Bloom from forming and carrying out plans in a disruptive emotional situation, including by highlighting possible inconsistencies between this opinion and Bloom's characterization of his own conduct in an interview with another expert, which the witness admittedly had considered in conducting his evaluation.

Moreover, during cross-examination, the prosecutor, without objection from defense counsel, gave Dr. Watson latitude to articulate what he believed the evidence showed about Bloom's mental state, a line of inquiry the defense followed up on in redirect examination, thus minimizing any conceivable prejudice from how the prosecutor framed her questions. Bloom has not shown prejudicial misconduct in this regard.[19]

### d. Asserted Griffin error

*Griffin v. California* (1965) 380 U.S. 609 (*Griffin*) holds that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (*Id.* at p. 615.) Bloom contends the prosecutor improperly commented in various ways on his invocation of the right to be silent, resulting in a violation of the rule announced in *Griffin*.

First, Dr. William Vicary, a defense expert witness who testified on direct that Bloom was likely to "snap" under

---

[19] Defendant also contends the prosecutor's questioning was at times rude, sarcastic, or disparaging, as when she alluded to neurological deficits and Asperger Syndrome "rearing their ugly heads" or to defendant's being "too whacked-out to know what he was doing." Although a prosecutor's intemperate behavior violates the federal Constitution if it infects the trial with such unfairness as to make the conviction a denial of due process (*People v. Samayoa, supra,* 15 Cal.4th at p. 841), and prosecutorial conduct that does not render a criminal trial fundamentally unfair violates state law if it involves the use of deceptive or reprehensible methods as a means to persuade the court or the jury (*People v. Penunuri* (2018) 5 Cal.5th 126, 149), the complained-of comments were mild and too fleeting to have adversely affected the fairness of the proceedings. Nor, for the same reason, did they amount to a prejudicial state-law violation.

stressful situations, acknowledged on cross-examination (over defense objection) that being on trial for murder and hearing the percipient and expert witnesses would be a stressful situation for Bloom, suggesting, according to Bloom, "that the jury could infer from the absence of conduct communicating appellant's distress in the courtroom that he did not break down in stressful situations." Bloom contends this questioning thus permitted the jury, improperly, "to infer facts about appellant's mental state during the crime from" his lack of assertive courtroom conduct, which Bloom would apparently treat as silence for *Griffin* purposes. But the prosecutor's question merely invited the jurors to make an inference from their observations of Bloom's courtroom demeanor; it did not constitute comment on his failure to testify or any other conduct that could reasonably be interpreted as a refusal to speak about the charged crimes.

Next, Bloom contends the prosecutor twice committed *Griffin* error during closing argument. In describing Bloom's interaction with Bloom, Sr., in front of the Sancola Avenue residence, the prosecutor argued, "We will never know what they were talking about out there." Then, in reviewing the evidence concerning Sandra's murder, the prosecutor suggested that after inflicting nonfatal stab wounds on the young girl, Bloom retrieved a live round and shot her. "And that explains why he only shot her once and left her breathing because he just was having trouble with that gun and he managed to find a live round, whether it was in that room or he went into another room, but he loaded the gun again and he shot her in the face. [¶] Now, does he go into the kitchen to try to fix the gun so he can find another live round to shoot her again? Is that what he was doing at the kitchen window? We will never know that. It is certainly a reasonable interpretation of what was going on in

that house that night." Defense counsel objected to both sets of comments, citing *Griffin*, and moved for a mistrial. The court overruled the objection and denied the motion.

We agree with the trial court in part and disagree in part. The prosecutor's comment that "we will never know what [Bloom and his father] were talking about out there" in front of the Sancola Avenue residence, in a conversation as to which only Bloom evidently could have testified, appears impermissible under *Griffin*. While a prosecutor does not violate the *Griffin* rule by commenting on the absence of certain evidence, a *Griffin* error does occur when the only possible source of such evidence would have been the defendant. (See, e.g., *People v. Johnson* (1992) 3 Cal.4th 1183, 1229 [prosecutor errs by referring to evidence as " 'uncontradicted' " or " 'unrefuted' " only when the defendant, who elects not to testify, is the only person who could have refuted it].) The comment, however, was brief and did not overtly call attention to Bloom's failure to take the stand at the guilt phase to explain what had occurred. We are satisfied beyond a reasonable doubt that the prosecutor's fleeting remark could not have prejudiced Bloom. (*Chapman, supra,* 386 U.S. at pp. 25–26.) By contrast, the prosecutor's statement that Bloom's entering the kitchen of the Sancola Avenue residence during the crimes may have been part of a search for a live round to shoot at Sandra constituted fair comment on the evidence. The prosecutor cautioned jurors that "we will never know that," while urging that it was "a reasonable interpretation" of the evidence. In context, the prosecutor was not drawing attention to the absence of direct testimony on the issue but advising the jury it was being asked to make an inference from the facts in evidence.

### e. *Asserted reliance on facts not in evidence*

In her guilt phase closing argument, the prosecutor sought to persuade jurors against returning a voluntary manslaughter verdict by reminding them "there is some evidence in this case that [Bloom, Sr.,] wasn't always a tyrant and there is some evidence in this case that he loved his son. You heard the telegrams . . . when [Bloom] was in the Navy and they were loving." As Bloom points out, the telegrams to which the prosecutor referred, sent by Bloom, Sr., to Bloom during the latter's brief stint in the Navy, were not admitted into evidence. Rather, the prosecutor called Bloom's mother, Melanie, to testify in rebuttal about language in the telegrams that expressed love for Bloom, contrary to Melanie's earlier testimony that she had never heard Bloom, Sr., do so.

The argument may well have been improper. The court allowed the prosecutor to question Melanie about the telegrams only in order to impeach her prior testimony that she had never heard Bloom, Sr., express love to Bloom, not as positive evidence that Bloom, Sr., had expressed love for Bloom. On the latter point, Melanie's testimony about the telegrams was hearsay for which the Attorney General posits no exception. The prosecutor's misuse of the testimony in argument did not render Bloom's trial unfair but could be characterized as deceptive, or at least misleading, conduct. We see no conceivable prejudice from the error, however, whether considered individually or in combination with the other asserted instances of prosecutorial misconduct.

### 5. *Instructional error*

#### a. *Conduct evidencing guilt*

Bloom contends the trial court erred in instructing the jury with CALJIC Nos. 2.06 and 2.52, concerning suppression of evidence and flight, respectively, as demonstrating consciousness of guilt. He argues they were unnecessary, misleading, and argumentative, allowed the jury to draw irrational inferences against him, and denied him his Sixth, Eighth, and Fourteenth Amendment rights to due process, a fair trial, a jury trial, equal protection, and reliable jury determinations of guilt and special circumstances.

As Bloom acknowledges, we have previously rejected these contentions (e.g., *People v. Streeter* (2012) 54 Cal.4th 205, 253–254 [CALJIC No. 2.52]; *People v. Dement* (2011) 53 Cal.4th 1, 52–53 [CALJIC No. 2.06]), and he advances no persuasive reason why we should reconsider our conclusions.

#### b. *Instructions assertedly undermining requirement of proof beyond reasonable doubt*

Bloom contends the trial court erred in reading the jury a series of instructions on the consideration of circumstantial and other evidence (CALJIC Nos. 2.01, 2.02, 2.21.2, 2.22, 2.27, and 8.20), which he contends diluted the reasonable doubt standard. Contrary to Bloom's claims, and as we have previously held, CALJIC Nos. 2.01 and 2.02 did not direct the jury to convict him of murder if he " 'reasonably appeared' " guilty, even if jurors still entertained a reasonable doubt of his guilt (*People v. Nakahara* (2003) 30 Cal.4th 705, 714), and CALJIC Nos. 2.21.2, 2.22, 2.27, and 8.20 did not urge the jury to decide material issues by determining which side had presented relatively stronger evidence (*People v. Casares* (2016) 62 Cal.4th 808, 831–

832).  "Because defendant advances no persuasive reason to depart from our precedents, we adhere to them here."  (*Id.* at p. 831.)

### C. Sanity Phase Issues

#### 1. *Refusal to allow Bloom to represent himself at the sanity phase*

As explained above, Bloom argues that the trial court erred in failing to suspend proceedings to adjudicate his competency during the sanity phase, an argument we have rejected. (See *ante*, pt. II.A.2.c.)  Bloom argues in the alternative that the court should have permitted him to represent himself in that portion of the trial.  We reject that contention as well.

Bloom advised the court he wished to represent himself for the sanity phase after the jury had been instructed and just before closing arguments in the guilt phase.  As the reason for his request, he referred to the court's decision to instruct the jury on voluntary manslaughter only as to the charge relating to Bloom, Sr.  He also mentioned there was an unspecified issue relating to penalty that, if resolved as he preferred, would cause him to withdraw his request to represent himself in the sanity phase.  Bloom acknowledged his lack of familiarity with the intricacies of the applicable law while nevertheless expressing confidence that he could handle the trial of the sanity phase.  Referring to prosecutor Samuels's previous comment that she had never conducted a sanity trial, Bloom commented, "So we can just do it for the first time together."  The court declined to rule at that time.

The court revisited the issue five days later during the jury's guilt deliberations.  After confirming that Bloom still wished to represent himself, the court denied the request.

Preliminarily, the court observed that the request was untimely, having been made after the start of trial, and it therefore had discretion whether to grant the request. The court cited two bases for denial: the complexity of the case and the likelihood the proceedings would be disrupted by delays, given the difficulties Bloom would encounter in trying to schedule psychiatric expert witnesses from jail. That prosecutor Samuels had never previously conducted a sanity trial was not, the court noted, a good reason for Bloom to represent himself. The court also expressed concern that allowing Bloom to represent himself might lead the jury to assume the court believed Bloom "competent and competent enough to represent [himself] at a very serious stage in the trial."

As Bloom acknowledges, *People v. Windham* (1977) 19 Cal.3d 121 (*Windham*) holds that to invoke the unconditional Sixth Amendment right to self-representation recognized in *Faretta*, *supra*, 422 U.S. 806, a defendant must do so "within a reasonable time prior to the commencement of trial." (*Windham*, at p. 128.) Bloom argues that nothing in *Faretta* supports such a limitation, and even a belated request must be granted unless it would entail undue delay or interfere with the orderly administration of justice.

The argument is without merit. *Faretta* itself recognized a constitutional right to self-representation in the context of a request made "weeks before trial." (*Faretta*, *supra*, 422 U.S. at p. 835.) In the years since, this court and others have concluded that that right is not absolute if not exercised until the eve of, or after the onset of, trial. (*People v. Wright* (2021) 12 Cal.5th 419, 440 [collecting cases]; see, e.g., *U.S. v. Tucker* (10th Cir. 2006) 451 F.3d 1176, 1180–1182; *U.S. v. Betancourt-Arretuche* (1st Cir. 1991) 933 F.2d 89, 96; cf. generally *Martinez v. Court of*

*Appeal of Cal., Fourth Appellate Dist.* (2000) 528 U.S. 152, 162 [noting that "most courts" require that *Faretta* rights be exercised in a timely manner].) We adhere to our previously expressed view that an untimely *Faretta* request is a matter entrusted to the court's discretion. In evaluating an untimely motion, a court may consider not only "the potential for delay and disruption" but also "whether the potential disruption is likely to be aggravated, mitigated, or justified by the surrounding circumstances, including the quality of counsel's representation to that point, the reasons the defendant gives for the request, and the defendant's proclivity for substituting counsel." (*People v. Buenrostro* (2018) 6 Cal.5th 367, 426.)

We see no abuse of discretion in the court's declining to permit Bloom to represent himself in the sanity phase. The court properly considered the possibility of unintended delay resulting from difficulties Bloom might encounter in attempting to schedule his expert witnesses from jail. Any such delay had the obvious potential to negatively affect trial administration, as two jurors had commitments that restricted their future availability. Given the complexity of a sanity phase trial in a capital case, the trial court could also reasonably find a real risk of delay from problems Bloom might have producing and organizing the defense evidence. Nor was the court required to spontaneously offer suggestions regarding potential ways to mitigate this risk.

Bloom argues the trial court abused its discretion by not "inquir[ing] *sua sponte* into the specific factors underlying the request thereby ensuring a meaningful record in the event that appellate review is later required." (*Windham, supra,* 19 Cal.3d at p. 128.) But while such an inquiry may be helpful to create an adequate record for our review (see *ibid.*), we conclude the

70

record here is sufficient to find the trial court's denial of Bloom's *Faretta* request was not an abuse of its discretion. As noted, one of the reasons the court cited — the complexity of the case and the attendant risk of delay — finds support in the record and affords a sound basis for the court's exercise of discretion in denying Bloom's *Faretta* request. Consequently, we need not address the validity of the other reason the court mentioned in making its ruling, its concern over inferences the jury might draw about the court's view of Bloom's competence.

### 2. *Allowing Bloom to absent himself*

Bloom contends the trial court erred under Penal Code sections 977 and 1043, which generally call for the defendant's presence at a trial on felony charges, and violated his state and federal constitutional rights to confrontation and due process, by allowing him to absent himself during the taking of evidence in the sanity phase and failing to ensure that his purported waiver of presence was knowing and intelligent. (U.S. Const., 5th, 6th, & 14th Amends.; Cal. Const., art. I, §§ 7, 15; *Johnson v. Zerbst* (1938) 304 U.S. 458, 464 [waiver standard].) We find no prejudicial error.

On the first day of the sanity phase, defense counsel informed the court that Bloom did not want to be present. Outside the presence of the jury, the court informed Bloom he had a right to be present and asked him what he wished to do. Bloom replied that he did not want to be present to hear the testimony in the sanity phase, though he wanted to be present for the reading of the verdict. In Bloom's absence, the court told the jury that "Mr. Bloom has chosen not to be present during this second phase of the sanity proceedings which he has a right to make that choice."

After evidence was presented and both sides rested in the sanity trial, the court asked if Bloom wished to be present; defense counsel indicated that Bloom wanted to be present when the verdicts were read and also wished to be brought into court to address his *Faretta* motion while the jury was deliberating. After the jury had begun deliberating, Bloom was brought into the courtroom and was present for the ensuing proceedings.

Penal Code section 1043 provides in relevant part that the defendant need not be present at trial in a felony case if the defendant persists in disrupting the trial and in "[a]ny prosecution for an offense which is not punishable by death in which the defendant is voluntarily absent." (*Id.*, subd. (b)(2).) We have held that Penal Code sections 977 and 1043, read together, preclude a nondisruptive capital defendant from waiving his or her presence during the taking of evidence before the trier of fact. (*People v. Weaver* (2001) 26 Cal.4th 876, 967–968.) Proceeding with the sanity trial in Bloom's absence was, therefore, error under state law (*People v. Young* (2005) 34 Cal.4th 1149, 1214), a point the Attorney General does not contest. Bloom argues this state law error was prejudicial under *People v. Watson* (1956) 46 Cal.2d 818, 836, because the jury deliberated at length before reaching its verdict on sanity on count 1 and was deadlocked on counts 2 and 3. But nothing in his argument, or in the record, suggests it is "reasonably probable that a result more favorable" (*ibid.*) to Bloom would have occurred had he been present during the presentation of sanity-phase evidence (see *People v. Mendoza* (2016) 62 Cal.4th 856, 902–903 [absence of capital defendant during receipt of evidence held harmless under the reasonable probability standard]).

A criminal defendant also has the right, under the Sixth Amendment's confrontation clause and under the due process guarantee of the Fifth and Fourteenth Amendments, "to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." (*Kentucky v. Stincer* (1987) 482 U.S. 730, 745; *People v. Jackson* (1996) 13 Cal.4th 1164, 1209.) But a defendant may waive his or her federal constitutional right of presence, provided the waiver is voluntary, knowing, and intelligent. (*Johnson v. Zerbst, supra*, 304 U.S. at p. 464.)

Bloom contends the trial court failed to ensure that his waiver met the constitutional standard by not adequately ensuring he understood the importance of the sanity phase and not inquiring into his reasons for absenting himself. He contends the record reflects he based his decision to absent himself from the sanity phase on an erroneous understanding of the significance of the sanity proceedings with respect to his death eligibility.

We see no constitutional deficiency in the waiver procedure employed here. We have not required that a trial court question the defendant regarding why he wishes to absent himself or admonish him concerning the importance of his decision. (*People v. Weaver, supra*, 26 Cal.4th at p. 967.) Here, as in *Weaver*, "[d]efendant was represented by counsel, and he himself chose, for his own reasons, to leave the courtroom." (*Ibid.*) To the extent Bloom argues the court's inquiry was "minimal" or "perfunctory," we note that even brief colloquies during which the trial court simply confirms a defendant's wish to waive his presence (*People v. Moon* (2005) 37 Cal.4th 1, 20–21) or informs him of his right to be present (*People v. Young*,

*supra*, 34 Cal.4th at pp. 1212–1213) have been deemed, as we deem this one, constitutionally adequate.

Bloom contends his choice to absent himself was influenced by a mistaken belief that the case would proceed to a penalty phase regardless of the outcome of the sanity phase, given the court's affirmative response to his earlier inquiry whether "the [guilt] verdicts by this jury trigger a penalty phase." But when the court responded in this manner, the jury had just reached its guilt verdicts and whether there would even be a sanity phase was uncertain. In the ensuing discussion, Bloom made clear that although he had not changed his mind regarding the dubious validity of the mental defense, the jury's rejection of first degree murder verdicts on counts 2 and 3 had convinced him to proceed with the sanity phase. He told the court: "I am not going to speak to you as a defendant right now, I am going to speak to you as a convict, okay? [¶] We always look for a way out, okay? And if I got a way out, I am going to take it. [¶] So let's go ahead and have the sanity phase, but let's be very clear about something. . . . [¶] So me having the sanity phase, I am not changing my mind on that. I am just saying that maybe I have a way out so I am going to take it." Bloom thus seemed to understand that if the jury were to find him not guilty by reason of insanity, he would be spared a death sentence, and for that reason he chose to go forward with the sanity phase. His decision to absent himself from it was not predicated on a mistaken belief that the outcome was of no consequence to the penalty he faced.

We conclude the trial court's acceptance of Bloom's decision to absent himself did not deprive Bloom of his federal constitutional rights.

### D. Cumulative Error

As explained above, we conclude that a violation of the rule of *McCoy*, *supra*, 138 S.Ct. 1500, requires the reversal of Bloom's two second degree murder convictions and associated enhancement and special circumstance findings. Bloom contends that even if no other error in his trial was so prejudicial that it separately warrants relief, the combined impact of other errors requires reversal of the judgment in its entirety. We have found or assumed the prosecutor engaged in misconduct (1) in her guilt phase opening statement, when she quoted from Bloom's argument to the jury in the prior trial, and (2) during her guilt phase closing argument, when she made comments that may have called the jury's attention to Bloom's failure to testify and that invited the jury to consider for its truth testimony that had been admitted for a nonhearsay purpose only. We have also found the trial court erred in permitting Bloom to absent himself from the sanity trial. In each such instance, we concluded prejudice was lacking. Now, considering the cumulative effect of all these errors, we reach the same conclusion. We accordingly reject Bloom's argument that the errors, taken together, require us to reverse the judgment in its entirety.

## III. DISPOSITION

We reverse the convictions for second degree murder on counts 2 and 3 and the associated firearm-use and weapon-use findings, as well as the multiple-murder special-circumstance finding and the judgment of death. We affirm the judgment in all other respects.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**JENKINS, J.**
**MARGULIES, J.**[*]

---

[*]    Associate Justice of the Court of Appeal, First Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Bloom

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S095223
**Date Filed:** April 21, 2022

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Darlene E. Schempp

_____

**Counsel:**

Michael J. Hersek, State Public Defender, Jeannie R. Sternberg, Deputy State Public Defender; and William T. Lowe, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Xavier Becerra and Rob Bonta, Attorneys General, Dane R. Gillette and Lance E. Winters, Chief Assistant Attorneys General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

William T. Lowe
Attorney at Law
P.O. Box 871
El Cerrito, CA 94530
(510) 230-4285

Michael R. Johnsen
Deputy Attorney General
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6090